19-1540-cv
Donald J. Trump v. Deutsche Bank AG

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2019

Argued:  August 23, 2019                    Decided: December 3, 2019

Docket No. 19-1540-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONALD J. TRUMP, DONALD J. TRUMP, JR., ERIC
TRUMP, IVANKA TRUMP, DONALD J. TRUMP
REVOCABLE TRUST, TRUMP ORGANIZATION, INC.,
TRUMP ORGANIZATION LLC, DJT HOLDINGS LLC,
DJT HOLDINGS MANAGING MEMBER LLC, TRUMP
ACQUISITION LLC, TRUMP ACQUISITION, CORP.,

Plaintiffs - Appellants,

v.

DEUTSCHE BANK AG, CAPITAL ONE FINANCIAL
CORPORATION,

Defendants - Appellees,

COMMITTEE ON FINANCIAL SERVICES OF THE
UNITED STATES HOUSE OF REPRESENTATIVES,
PERMANENT SELECT COMMITTEE ON
INTELLIGENCE OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,

Intervenor Defendants - Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, HALL, and LIVINGSTON, *Circuit Judges*.

Expedited interlocutory appeal from the May 22, 2019, order of the District Court for the Southern District of New York (Edgardo Ramos, District Judge) denying Plaintiffs-Appellants' motion for a preliminary injunction to prevent the Defendants-Appellees' compliance with subpoenas issued to them by the Intervenor Defendants-Appellees and denying Plaintiffs-Appellants' motion for a stay pending appeal.

Affirmed in substantial part and remanded in part. Judge Livingston concurs in part and dissents in part with a separate opinion.

> Patrick Strawbridge, Consovoy McCarthy PLLC, Boston, MA (William S. Consovoy, Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, VA, Marc Lee Mukasey, Mukasey Frenchman & Sklaroff LLP, New York, NY, *on the brief*), for Plaintiffs-Appellants Donald J. Trump, Donald J. Trump, Jr., Eric Trump, Ivanka Trump, Donald J. Trump Revocable Trust, Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp.

> Douglas N. Letter, General Counsel, U.S. House of Representatives, Washington, D.C. (Todd B. Tatelman, Dep. General Counsel, Megan

2

Barbero, Josephine Morse, Assoc. General Counsel, Office of General Counsel, U.S. House of Representatives, Washington, D.C., *on the brief*), for Intervenor Defendants-Appellees Committee on Financial Services and Permanent Select Committee on Intelligence of the United States House of Representatives.

Parvin D. Moyne, Akin Gump Strauss Hauer & Feld LLP, New York, NY (Thomas C. Moyer, Raphael A. Prober, Steven R. Ross, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.), for Defendant-Appellee Deutsche Bank AG.

James A. Murphy, Murphy & McGonigle, PC, New York, NY (Steven D. Feldman, Murphy & McGonigle, PC, New York, NY), for Defendant-Appellee Capital One Financial Corporation.

(Dennis Fan, Mark R. Freeman, Scott R. McIntosh, Appellate Staff Attys., Joseph H. Hunt, Asst. Atty. General, Hashim M. Mooppan, Dep. Asst. Atty. General, Civil Division, U.S. Dept. of Justice, Washington, D.C., for amicus curiae United States of America.)

(Brianne J. Gorod, Elizabeth B. Wydra, Brian R. Frazelle, Ashwin P. Phatak, Constitutional Accountability Center, Washington, D.C., for amicus curiae Constitutional Accountability Center, in support of Intervenor Defendants-Appellees.)

3

JON O. NEWMAN, Circuit Judge:

This appeal raises an important issue concerning the investigative authority of two committees of the United States House of Representatives and the protection of privacy due the President of the United States suing in his individual, not official, capacity with respect to financial records. The specific issue is the lawfulness of three subpoenas issued by the House Committee on Financial Services and the House Permanent Select Committee on Intelligence (collectively, "Committees" or "Intervenors") to two banks, Deutsche Bank AG and Capital One Financial Corporation ("Capital One") (collectively, "Banks"). The subpoenas issued by each of the Committees to Deutsche Bank ("Deutsche Bank Subpoenas") seek identical records of President Donald J. Trump ("Lead Plaintiff"), members of his family, The Trump Organization, Inc. ("Trump Organization"), and several affiliated entities (collectively, "Plaintiffs" or "Appellants"). The subpoena issued by the Committee on Financial Services to Capital One ("Capital One Subpoena") seeks records of the Trump Organization and several affiliated entities. The Capital One Subpoena does not list the Lead Plaintiff or members of his family by name, but might seek their records in the event they are a principal, director, shareholder, or officer of any of the listed entities.

The issue of the lawfulness of the three subpoenas arises on an expedited interlocutory appeal from the May 22, 2019, Order of the District Court for the Southern District of New York (Edgardo Ramos, District Judge) ("Order") denying Plaintiffs' motion for a preliminary injunction to prevent the Banks' compliance with the subpoenas and denying Plaintiffs' motion for a stay pending appeal.

We affirm the Order in substantial part to the extent that it denied a preliminary injunction and order prompt compliance with the subpoenas, except that the case is remanded to a limited extent for implementation of the procedure set forth in this opinion concerning the nondisclosure of sensitive personal information and a limited opportunity for Appellants to object to disclosure of other specific documents within the coverage of those paragraphs of the Deutsche Bank Subpoenas listed in this opinion. We dismiss as moot the appeal from the Order to the extent that it denied a stay pending appeal because the Committees agreed not to require compliance with the subpoenas pending the appeal, once the appeal was expedited.

In her partial dissent, Judge Livingston prefers a total remand of the case for "creation of a record that is sufficient more closely to examine the serious questions that the Plaintiffs have raised," Part Diss. Op. at 10–11, and to "afford

5

the parties an opportunity to negotiate," *id*. at 11. We discuss at pages 69–72 of this opinion not only why such a remand is not warranted but why it would also run counter to the instruction the Supreme Court has given to courts considering attempts to have the Judicial Branch interfere with a lawful exercise of the congressional authority of the Legislative Branch.

## Background

*The subpoenas*. The case concerns three subpoenas issued by committees of the United States House of Representatives. On April 11 of this year, the Committee on Financial Services and the Permanent Select Committee on Intelligence each issued identical subpoenas to Deutsche Bank, seeking a broad range of financial records of Donald J. Trump, members of his family, and affiliated entities. On the same date, the Committee on Financial Services issued a subpoena of narrower scope to Capital One Financial Corporation.[1] We detail the scope of the subpoenas in Part II(C).

*Litigation procedure*. On April 29, Donald J. Trump, his three oldest children, the Trump Organization, and six entities affiliated with either the Lead Plaintiff or

---

[1] The subpoenas issued by the Committee on Financial Services are not dated, but we were informed at oral argument that they were issued on April 11.

the Trump Organization[2] filed a complaint in the District Court seeking a declaratory judgment that the subpoenas are invalid and an injunction "quashing" the subpoenas and enjoining compliance with them.[3] On May 3, the Plaintiffs filed a motion for a preliminary injunction,[4] and the District Court granted the Committees' joint motion to intervene.[5] The Plaintiffs and the Committees then agreed to an expedited briefing schedule for the motion for a preliminary injunction.[6] Deutsche Bank notified the District Court that it took no position on the Plaintiffs' request for limited expedited discovery,[7] and Capital One notified the District Court that it took no position on the Plaintiffs' request for an order requiring the Committees to provide Plaintiffs with copies of the subpoenas.[8]

On May 22, the District Court held a hearing on the Plaintiffs' motion for a preliminary injunction and denied it, reading into the record an extensive opinion.[9] On May 24, the Plaintiffs filed a notice of an interlocutory appeal. On

---

[2] They are Donald J. Trump Revocable Trust, Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, and Trump Acquisition, Corp.

[3] *Trump v. Deutsche Bank*, No. 19-cv-3826 (S.D.N.Y. 2019), Dkt. No. 1 (Apr. 29, 2019).

[4] *Id.*, Dkt. No. 26 (May 3, 2019).

[5] *Id.*, Dkt. No. 31 (May 3, 2019).

[6] *Id.*, Dkt. No. 21 (May 1, 2019).

[7] *Id.*, Dkt. No. 38 (May 7, 2019).

[8] *Id.*, Dkt. No. 40 (May 7, 2019).

[9] *Id.*, Dkt. No. 59 (May 22, 2019).

May 25, the parties submitted a joint motion to stay proceedings in the District

Court pending the appeal,[10] which the District Court granted on May 28.[11]

On May 25, the parties jointly moved in this Court for an expedited appeal,[12]

which was granted on May 31.[13] Thereafter, the Banks informed us that they take

no position with respect to the appeal.[14] Nevertheless, we requested counsel for

the Banks to attend the oral argument to be available to respond to any questions

the panel might have.[15] We requested the Committees to provide unredacted

copies of the Deutsche Bank subpoenas, which we have received under seal. We

also inquired of the United States Solicitor General whether the United States

would like to submit its view on the issues raised on this appeal.[16] On August 19,

the United States submitted a brief as amicus curiae, urging reversal of the District

---

[10] *Id.*, Dkt. No. 61 (May 25, 2019).

[11] *Id.*, Dkt. No. 62 (May 28, 2019).

[12] *Trump v. Deutsche Bank*, No. 19-1540 (2d Cir. 2019), Dkt. No. 5 (May 25, 2019).

[13] *Id.*, Dkt. No. 8 (May 31, 2019). In the parties' joint motion to expedite the appeal, the Committees agreed that if the appeal were expedited, they would suspend compliance with the subpoenas during the pendency of the appeal "except to the extent the subpoenas call for the production of documents unrelated to any person or entity affiliated with Plaintiff-Appellants." J. Mot. to Expedite at 2, *id.*, Dkt. No. 5 (May 25, 2019). Granting the motion to expedite the appeal has therefore rendered moot the appeal from the District Court's order to the extent that it denied a stay pending appeal.

[14] *Id.*, Dkt. Nos. 66 (July 11, 2019), 71 (July 12, 2019).

[15] *Id.*, Dkt. No. 81 (July 17, 2019).

[16] *Id.*, Dkt. No. 80 (July 17, 2019).

Court's order denying a preliminary injunction,[17] to which the Committees and Appellants responded on August 21.[18] On August 23, we heard oral argument.

The oral argument precipitated letters from the parties to this Court concerning tax returns sought pursuant to the subpoenas. These letters and subsequent procedural developments are discussed in Part II(B).

## Discussion

We emphasize at the outset that the issues raised by this litigation do not concern a dispute between the Legislative and Executive Branches. As to such a dispute, as occurs where the Justice Department, suing on behalf of the United States, seeks an injunction to prevent a third party from responding to a congressional committee's subpoena seeking documents of a department or agency of the Executive Branch, *see, e.g.*, *United States v. AT&T*, 567 F.2d 121, 122 (D.C. Cir. 1977) ("*AT&T II*"), the Judicial Branch proceeds with caution, *see id.* at 123 (seeking to "avoid a resolution that might disturb the balance of power between the two branches"), sometimes encountering issues of justiciability in advance of the merits, *see United States v. AT&T*, 551 F.2d 384, 390 (D.C. Cir. 1976) ("*AT&T I")*. Although the challenged subpoenas seek financial records of the

---

[17] *Id.*, Dkt. No. 143 (Aug. 19, 2019).
[18] *Id.*, Dkt. Nos. 148, 149 (Aug. 21, 2019).

person who is the President, no documents are sought reflecting any actions taken by Donald J. Trump acting in his official capacity as President. Indeed, the Complaint explicitly states that "President Trump brings this suit solely in his capacity as a private citizen." Complaint ¶ 13. Appellants underscore this point by declining in this Court to assert as barriers to compliance with the subpoenas any privilege that might be available to the President in his official capacity, such as executive privilege. *See Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1499 (2019) (citing *United States v. Nixon*, 418 U.S. 683, 705–06 (1974)). The protection sought is the protection from compelled disclosure alleged to be beyond the constitutional authority of the Committees, a protection that, if validly asserted, would be available to any private individual. *See Barenblatt v. United States*, 360 U.S. 109 (1959); *Watkins v. United States*, 354 U.S. 178 (1957). For this reason, in the remainder of this opinion we will refer to President Trump as the "Lead Plaintiff"; the formal title "President Trump" might mislead some to think that his official records are sought, and the locution "Mr. Trump," sometimes used in this litigation, might seem to some disrespectful.

Also at the outset, we note that there is no dispute that Plaintiffs had standing in the District Court to challenge the lawfulness of the Committees'

subpoenas by seeking injunctive relief against the Banks as custodians of the documents. *See United States Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1260 (D.C. Cir. 1973) ("[T]he plaintiffs have no alternative means to vindicate their rights.") (italics omitted), *rev'd on other grounds without questioning plaintiffs' standing*, 421 U.S. 491 (1975).

We review denial of a preliminary injunction for abuse of discretion, *see, e.g., Ragbir v. Homan*, 923 F.3d 53, 62 (2d Cir. 2019), but our review is appropriately more exacting where the action sought to be enjoined concerns the President, even though he is suing in his individual, not official, capacity, in view of "'[t]he high respect that is owed to the office of the Chief Executive'" that "'should inform the conduct of [an] entire proceeding,'" *Cheney v. United States District Court*, 542 U.S. 367, 385 (2004) (first brackets in original) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)).

I. Preliminary Injunction Standard

In this Circuit, we have repeatedly said that district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets either of two standards: "(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and

11

a balance of hardships tipping decidedly in the movant's favor."[19] *Kelly v.*

*Honeywell International, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019) (quotation marks

---

[19] The first component of the "serious-questions" standard has sometimes been phrased as requiring a party seeking a preliminary injunction to show "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Financial Services*, 769 F.3d 105, 110 (2d Cir. 2014). That formulation raises the question whether the referent of "them" is "claims" or "serious questions." Normally, the referent of a pronoun is the word or phrase immediately preceding it. That would mean that a plaintiff's "claims" must be sufficiently serious to make them a fair ground for litigation. But the *Otoe-Missouria Tribe* formulation could also be read to mean that the "serious questions" must be sufficiently serious to make them a fair ground for litigation.

The origin and evolution of the serious-questions standard indicate that what must be sufficiently serious to be a fair ground of litigation are the questions that the plaintiff's claims raise, not the claims themselves (although the distinction probably makes little, if any, difference in practice). The first version of what has become the first component of the serious-questions standard appears in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953), where we referred to "questions going to the merits so serious, substantial, difficult and doubtful, as to make *them* a fair ground for litigation," *id.* at 740 (emphasis added). This formulation was repeated verbatim later the same year in *Unicon Management Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2d Cir. 1966), and *Dino DeLaurentis Cinematografica, S.p.A. v. D-150, Inc.*, 366 F.2d 373, 376 (2d Cir. 1966). This formulation was substantially repeated three years later in *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319 (2d Cir. 1969), but with omission of the word "doubtful," *id.* at 323. Three years later, in *Stark v. New York Stock Exchange*, 466 F.2d 743 (2d Cir. 1972), we shortened the formulation to just "serious questions going to the merits." *Id*. at 744. The following year, in *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687 (2d Cir. 1973), we expanded that short version to "serious questions going to the merits which warrant further investigation for trial." *Id*. at 692. Later that year, in *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973), there first appeared the current version of the formulation, "sufficiently serious questions going to the merits to make *them* a fair ground for litigation." *Id.* at 250 (emphasis added). This formulation was repeated verbatim in a series of cases. *See Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750 (2d Cir. 1977); *Selchow & Richter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978); *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *see also* William H. Mulligan, *Foreword—Preliminary Injunction in the Second Circuit*, 43 Brook. L. Rev. 831 (primarily considering requirement of irreparable injury).

Thereafter, this Court and district courts in this Circuit cited *Jackson Dairy* and its formulation of the serious-questions standard innumerable times, as the citing references collected by Westlaw indicate, until in *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989), the formulation was rephrased to "sufficiently serious questions going to the merits of

deleted); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

The Committees contend that the likelihood-of-success standard applies; Appellants contend that the serious-questions standard applies.[20]

With respect to irreparable harm, a factor required under either standard, Appellants contend that compliance with the subpoenas will cause them such

its claims to make them fair ground for litigation." *Id*. at 580. *Plaza Health Laboratories* added the phrase "of its claims," thereby creating the grammatical query considered in this footnote. *Plaza Health Laboratories* cited only *Sperry International Trade, Inc. v. Government of Israel*, 670 F.2d 8 (2d Cir. 1982), and *Jackson Dairy*, but both of those opinions had used the traditional formulation without the phrase "of its claims." *See Sperry International Trade*, 670 F. 2d at 110; *Jackson Dairy*, 598 F.2d at 11. A Westlaw search reveals that the *Plaza Health Laboratories* formulation has been used by this Court just fifteen times, and the *Jackson Dairy* formulation has been used 226 times.

In view of the evolution of, and this Court's clear preference for, the *Jackson Dairy* formulation, we will use it in this opinion, thereby avoiding the grammatical query posed by the *Plaza Health Laboratories* formulation. We will also use the article "a" before "fair ground for litigation," which *Plaza Health Laboratories* and some of the opinions citing it omitted, but which is always included in the opinions using the *Jackson Dairy* formulation.

[20] In their reply brief, Appellants contend that "the Committees conceded [in the District Court] that the serious-questions standard applies." Reply Br. for Appellants at 2. They cite footnote 28 of the Committees' memorandum in opposition to the motion for a preliminary injunction. We normally do not consider an issue raised for the first time in a reply brief. *See McBride v. BIC Consumer Products Manufacturing Co.*, 583 F.3d 92, 96 (2d Cir. 2009). In any event, Appellants' claim is without merit.

The Committees' footnote states, "To the extent there is any meaningful distinction between the *Winter* [*v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)] standard and the 'serious questions' formulation, that has also been used by the Second Circuit in post-*Winter* cases, *see Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 36–38 (2d Cir. 2010), this Court need not consider that nuance here because Mr. Trump has failed to meet the heavy burden required under either standard." Dist. Ct. Dkt. No. 51, at 10 n.28 (citation omitted) (May 10, 2019). Stating that the Lead Plaintiff had not met either the likelihood-of-success standard or the serious-questions standard is not a concession that the lesser standard applies. Moreover, in the sentence of text to which the footnote is appended, the Committees explicitly contend that the higher standard applies, stating that to obtain a preliminary injunction "a plaintiff 'must establish that he is likely to succeed on the merits.'" *Id*. at 10 (quoting *New York Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2003)).

13

harm. In the District Court, the Committees took the position that whether compliance would cause Appellants irreparable harm would depend on whether the Committees would make public the documents obtained.[21] The District Court ruled that compliance would cause irreparable harm because "plaintiffs have an interest in keeping their records private from everyone, including congresspersons," and "the committees have not committed one way or the other to keeping plaintiffs' records confidential from the public once received." J. App'x 122–23. We agree.

The issue therefore becomes whether Appellants seeking a preliminary injunction had to meet (1) the more rigorous standard of a likelihood of success on the merits or (2) the less rigorous standard of sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in their favor.[22]

---

[21] Counsel for the Committees said to the District Court, "[J]ust because documents are turned over to Congress, that itself is not irreparable injury. The question is if Congress was going to disclose them. So just turning it over to Congress is not irreparable injury." J. App'x 111.

[22] One opinion of this Court noted that "[b]ecause the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted) (emphasis in original). Although that might have been the situation on the facts of that case, there can be no doubt, as we have repeatedly said, that the likelihood-of-success standard is more rigorous than the serious-questions standard. *See, e.g.*, *Central Rabbinical Congress of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (likelihood-of-success

14

With slightly different formulations, we have repeatedly stated that the serious-questions standard cannot be used to preliminarily enjoin governmental action. *See Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) (applying more rigorous likelihood-of-success standard in affirming denial of preliminary injunction against "governmental action taken in the public interest pursuant to a statutory or regulatory scheme"); *Union Carbide Agricultural Products Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir. 1980) (same, with respect to "governmental action that is in the public interest"); *Medical Society of State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977) (same, where "interim relief [enjoining governmental action] may adversely affect the public interest"); *see also Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) ("As long as the action to be enjoined is taken pursuant to a statutory or regulatory scheme, even government action with respect to one litigant requires application of the 'likelihood of success' standard.").

Nevertheless, in two decisions, we have affirmed preliminary injunctions against government action issued using the less rigorous serious-questions

standard "more rigorous"); *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (same); *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (same); *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (same).

15

standard. *See Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir. 1992) (officials of the Immigration and Naturalization Service enjoined), *judgment vacated as moot sub nom. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993); *Mitchell v. Cuomo*, 748 F.2d 804, 806–08 (2d Cir. 1984) (state prison officials enjoined). We have sometimes affirmed decisions that issued or denied preliminary injunctions against government action using both standards. *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763 (2d Cir. 1988) (preliminary injunction denied under both standards); *Patton v. Dole*, 806 F.2d 24, 28–30 (2d Cir. 1986) (preliminary injunction granted under both standards); *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1141–42 (2d Cir. 1986) (preliminary injunction denied under both standards).

*Haitian Centers* noted that "the 'likelihood of success' prong need not *always* be followed merely because a movant seeks to enjoin government action." 969 F.2d at 1339 (emphasis added). Then, building on the statement in *Plaza Health Laboratories* that the less rigorous standard may not be used to enjoin "governmental action *taken in the public interest* pursuant to a statutory or regulatory scheme," 878 F.2d at 580 (emphasis added), *Haitian Centers* noted that "no party has an exclusive claim on the public interest," 969 F.2d at 1339. That

16

point influenced our later decision in *Time Warner Cable of New York City L.P. v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997), where, noting that "there are public interest concerns on both sides" of the litigation, *id*. at 923, we said that the serious-questions standard "would be applicable," *id.* at 924, even though we ultimately decided the case under the likelihood-of-success standard, *see id.*

In *Able*, we noted that the government action exception to the use of the serious-questions standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly," 44 F.3d at 131, and that the likelihood-of-success standard was appropriate in that case "where the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations," *id*. We also pointed out that *Haitian Centers* had approved use of the serious-questions standard to challenge action taken pursuant to a "policy formulated solely by the executive branch." *Id*. Based on these statements, Appellants contend that only the serious-questions standard applies

17

to challenge any action "taken pursuant to a policy formulated by one branch." Reply Br. for Appellants at 3 (quotation marks and brackets omitted).

We think that argument fails by endeavoring to make a requirement out of the sentences we have quoted from *Able*. The fact that legislation developed by both branches of the federal government is entitled to a higher degree of deference does not mean that *only* such action is entitled to the deference reflected in the likelihood-of-success standard. The Supreme Court has said that a high degree of deference should be accorded to actions taken solely by Congress, *see United States v. Rumely*, 345 U.S. 41, 46 (1953) (admonishing courts to "tread warily" "[w]henever constitutional limits upon the investigative power of Congress have to be drawn"), and we have often approved application of the more rigorous likelihood-of-success standard to enjoin action taken by units of government with far less authority than the combined force of the national Legislative and Executive Branches. For example, we have ruled that the more rigorous likelihood-of-success standard was applicable when a preliminary injunction was sought to prohibit a municipal agency from enforcing a regulation, *see Central Rabbinical Congress of U.S. and Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014); to prohibit New York City's Taxi & Limousine Commission from

enforcing changes to lease rates, *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010); to require one branch of a state legislature to undo its expulsion of a state senator, *see Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010); to prohibit a town from hiring police officers and firefighters, *see NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995); to prohibit the Metropolitan Transit Authority from implementing a staff reduction plan, *see Molloy v. Metropolitan Transportation Authority*, 94 F.3d 808, 811 (2d Cir. 1996); to prohibit the New York City Transit Authority from increasing subway and bus fares, *see New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036 n.7 (2d Cir. 1995); to prohibit New York State's Department of Social Services from suspending a health–care services provider from participating in the State's medical assistance program, *see Plaza Health Laboratories*, 878 F.2d at 580, and to prohibit two commissioners of New York state agencies from enforcing provisions of state law, *see Medical Society*, 560 F.2d at 538.

In dissent, Judge Livingston questions the significance of decisions such as these on two grounds. First, she suggests that some of them lacked sufficient analysis. *See* Part. Diss. Op. at 44. However, with exceptions not relevant here, panels of this Court are bound by the holdings of prior panels, *see*, *e.g.*, *Lotes Co. v.*

*Hon Hal Precision Industry Co.*, 753 F.3d 395, 405 (2d Cir. 2014); *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004), and those holdings are not to be disregarded by any claimed insufficiency of an opinion's analysis. Second, she suggests that we might have used the more rigorous likelihood-of-success standard in these cases because of federalism concerns. *See* Part. Diss. Op. at 45, n.28. However, none of the eight decisions even hints that federalism concerns influenced the use of the likelihood-of-success standard.

We have not previously had occasion to consider whether enforcement of a congressional committee's subpoena qualifies as, or is sufficiently analogous to, "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," *Plaza Health Laboratories*, 878 F.2d at 580, so as to preclude application of the less rigorous serious-questions standard. Facing that issue, we conclude that those seeking to preliminarily enjoin compliance with subpoenas issued by congressional committees exercising, as we conclude in Part II(C), their constitutional and duly authorized power to subpoena documents in aid of both regulatory oversight and consideration of potential legislation must satisfy the more rigorous likelihood-of-success standard. Surely such committees should not be enjoined from accomplishing their tasks under a less rigorous standard than we

20

applied to plaintiffs seeking to preliminarily enjoin state and local units of government in *Central Rabbinical Congress*, *Metropolitan Taxicab Board of Trade*, *Monserrate*, *Town of East Haven*, *Molloy*, *New York Urban League*, *Plaza Health Medical Society*, discussed above. None of those cases involved implementation of a policy "developed through presumptively reasoned democratic processes" and resulting from "the full play of the democratic process involving both the legislative and executive branches," which were the elements present in *Able*, 44 F.3d at 131. Yet in all eight cases, we applied the likelihood-of-success standard. Indeed, in *Monserrate* we applied the more rigorous standard to a plaintiff seeking to preliminarily enjoin action taken by just one body of a state legislature. We will therefore apply the likelihood-of-success standard to Appellants' motion for a preliminary injunction in this case.

Before leaving the issue of the applicable preliminary injunction standard, we should reckon with the preliminary injunction standard formulated in 2008 by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that

21

an injunction is in the public interest." *Id.* at 20. This formulation incorporates both the irreparable injury requirement and the likelihood-of-success requirement from the more rigorous standard we have been using, includes from our less rigorous serious-questions standard a balance of equities (similar to hardships) that tips in favor of the plaintiff (although not including the requirement of sufficiently serious questions going to the merits to make them a fair ground for litigation nor the requirement that the balance of hardships tips *decidedly* in the plaintiff's favor), and adds as a fourth requirement that the injunction is in the public interest.

It is not clear whether the Supreme Court intended courts to require these four components of the *Winter* standard in all preliminary injunction cases. *Winter* concerned military operations affecting the national security, testing for submarine detection, and two of the three cases cited to support the *Winter* formulation also concerned national security issues, *Munaf v. Geren*, 553 U.S. 674 (2008) (transferring U.S. military prisoners in a foreign country to that country's government), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) (training the Navy's bomber pilots). The third case, *Amoco Production Co. v. Village of Gambell*,

480 U.S. 531 (1987), concerned a matter unrelated to national security—drilling for oil and natural gas.[23]

In any event, two years after the Supreme Court's decision in *Winter*, our Court explained why we did not believe that the Supreme Court had precluded our use of the two preliminary injunction standards that we had used for five decades. *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010). However, *Citigroup* shed no light on which of those standards was applicable to plaintiffs seeking to preliminarily enjoin governmental action. That case involved a motion by a brokerage firm to preliminarily enjoin a hedge fund from pursuing an arbitration. S*ee id*. at 32.

---

[23] Uncertainty as to use of the *Winter* formulation for all preliminary injunctions remained after the Supreme Court's decision the next year in *Nken v. Holder*, 556 U.S. 418 (2009). In language similar to that used in *Winter*, the Court identified the four factors applicable to the grant of a stay pending appeal—"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 434 (quotation marks omitted). The Court then stated that "[t]here is substantial overlap between these [four factors] and the factors governing preliminary injunctions," although the two are not "one and the same." *Id*.

In *Winter*, the first factor did not include the words "strong showing," 555 U.S. at 20; the second factor used the word "likely" to modify "suffer irreparable harm, *id*.; the third factor was "the balance of equities tips in [the plaintiff's] favor," *id*.; and the fourth factor was that an injunction "is in the public interest," *id*. Unlike *Winter*, which had set out four factors that an applicant for a preliminary injunction "must establish," *id*., *Nken* said that the applicable legal principles "have been distilled into *consideration* of four factors." 556 U.S. at 434 (emphasis added).

Although we have concluded that the likelihood-of-success standard applies in this case and have determined that Appellants have established irreparable injury, a requirement common to both of our preliminary injunction standards and the Supreme Court's *Winter* formulation, we will proceed to consider not only whether Appellants have met the governing likelihood-of-success standard but also whether they have satisfied the other requirements in one or more of these three standards: sufficiently serious questions going to the merits of their claims to make them fair ground for litigation, a balance of hardships tipping decidedly in their favor, and the public interest favoring an injunction. We turn first to the merits of their statutory and constitutional claims in order to determine what we regard as the critical issue: likelihood of success.

II. Likelihood of Success

A. Statutory Claim—RFPA

Appellants contend that the subpoenas are invalid for failure of the Committees to comply with the Right to Financial Privacy Act ("RFPA" or "Act"), 12 U.S.C. §§ 3401–3423. RFPA prohibits a financial institution's disclosure of a customer's financial records to "any Government authority" except in accordance with the Act's procedural requirements. § 3403(a). The Committees acknowledge

noncompliance with those requirements, but contend that RFPA does not apply to them because they are not a "Government authority" within the meaning of section 3403(a). Because the Act defines "Government authority" to mean "any agency or department of the United States, or any officer, employee, or agent thereof," § 3401(3), the precise statutory issue is whether Congress or one of its committees is an "agency or department of the United States."

We begin with the plain meaning of "agency or department" at the time RFPA was enacted in 1978. Appellants do not argue that "agency" could possibly refer to Congress; the sole dispute is over the word "department." Appellants contend that "department" is used in RFPA to mean any of the three branches of government. The Committees, on the other hand, contend that the word is used to mean some component of the Executive Branch.

Contemporary dictionaries support the Committees' interpretation. *See* Webster's Third New International Dictionary (1971) (defining "department" as "an *administrative* division or branch of a national or municipal government") (emphasis added); Black's Law Dictionary (5th ed. 1979) (defining "department" as "[o]ne of the major *administrative* divisions of the executive branch of the

25

government usually headed by an officer of cabinet rank; *e.g.,* Department of State") (emphasis added).

Moreover, other contextual clues in RFPA indicate that neither Congress nor its committees are an "agency or department of the United States" within the meaning of RFPA, and therefore Congress did not subject itself or its committees to the Act. Section 3408 permits a "Government authority" to request financial records "pursuant to a formal written request only if . . . the request is authorized by regulations promulgated by the head of the agency or department." § 3408(2). Congress does not promulgate regulations, and its leadership and that of its committees are not considered the "head" of an "agency or department." The Supreme Court has stated that "[t]he term 'head of a Department' means . . . the Secretary in charge of a great division of the [E]xecutive [B]ranch of the government, like the State, Treasury, and War, who is a member of the Cabinet." *Burnap v. United States*, 252 U.S. 512, 515 (1920); *accord Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 886 (1991).

The several mechanisms for obtaining financial records all require that the records sought are "relevant to a legitimate law enforcement inquiry,"[24] § 3405(1) (administrative summons or subpoena), § 3407(1) (judicial subpoena), § 3408(3) (formal written request), but, as Appellants correctly point out and the Committees agree, Congress cannot exercise "any of the powers of law enforcement" because "those powers are assigned under our Constitution to the Executive and the Judiciary," *Quinn v. United States*, 349 U.S. 155, 161 (1955).

RFPA directs the Office of Personnel Management ("OPM") to determine whether "disciplinary action is warranted against [an] agent or employee" of "any agency or department" found to have willfully violated the Act. § 3417(b). However, OPM is "the lead personnel agency for civilian employees in the [E]xecutive [B]ranch." *United States Dep't of Air Force v. Federal Labor Relations Authority*, 952 F.2d 446, 448 (D.C. Cir. 1991). It is highly unlikely that Congress would have directed OPM to take disciplinary action against congressional staff.

RFPA provides civil penalties, including punitive damages, for any "agency or department" that violates the Act's requirements. § 3417(a). It is also highly

---

[24] RFPA defines "law enforcement inquiry" as "a lawful investigation or official proceeding inquiring into a violation of, or failure to comply with, any criminal or civil statute or any regulation, rule, or order issued pursuant thereto." 12 U.S.C. § 3401(8).

unlikely that Congress would have subjected itself to such penalties, especially in the absence of a clear indication of an intent to do so.

Although no one of these provisions alone conclusively establishes that RFPA does not apply to Congress, in the aggregate they provide persuasive textual support for that reading of the Act. This conclusion is strongly reinforced by the Act's legislative history. A draft bill submitted by the Departments of Justice and the Treasury would have explicitly covered access to financial records by Congress, and distinguished Congress from "any agency or department of the United States."[25]

---

[25] *Electronic Funds Transfer & Financial Privacy: Hearings on S. 2096, S. 2293, & S. 1460 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 397 (1978) (hereinafter "*Hearings*").

    *Hearings* includes a draft bill, dated May 17, 1978, and referred to as "Title XI—Right to Financial Privacy," which is identified by a note stating, "This Draft represents the combined views of the Departments of Justice and the Treasury, subject to further revision." *Hearings* at 397 n.*. The definition section of that bill provides:

> "'[G]overnment authority' means *the Congress of the United States*, or any agency or department of the United States or of a State or political subdivision, or any officer, employee or agent of any of the foregoing."

*Hearings* at 397 (emphasis added) (explaining definitional provision, § 1101(3)). This provision not only explicitly made the bill applicable to Congress, but it also reflected the view of Justice and the Treasury that "agency or department of the United States" did not include Congress.

    *Hearings* also contains a section-by-section analysis of the Justice-Treasury draft bill submitted on May 17, 1978. *See Hearings* at 365 & n.*. That analysis includes the following explanation of the coverage of the draft bill:

> "The 'government authorities' whose actions are restricted by the bill include any agency or department of the United States or any State or political subdivision, or any of their officers, employees, or agents. *The Congress is also covered*, since it may use financial records in its investigations to which the same privacy rights should adhere."

The rejection of this provision of the Justice-Treasury proposal by omitting Congress from the enacted definition of "government authority" is strong evidence of a deliberate decision by Congress not to apply the Act to itself. Although the failure of Congress to enact is often an unreliable indication of congressional intent, *see Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993) ("As a general matter, we are reluctant to draw inferences from Congress' failure to act.") (quotation marks omitted), the omission of pertinent language from a bill being considered by Congress is far more probative of such intent, especially when the omission is from a draft bill submitted by the Department of Justice, a principal source of proposed legislation.

---

*Hearings* at 366 (emphasis added) (explaining definitional provision).

As explained by then-Deputy Attorney General Benjamin R. Civiletti, "[O]ur proposal would extend these important procedures and privacy rights to cover investigations by the Legislative as well as the Executive Branch." *Hearings* at 189, 194.

*Hearings* also includes an analysis prepared by the Congressional Research Service of the Library of Congress, comparing what is called "Draft Proposed by Justice Dept." with S. 14 and S. 2096. *Hearings* at 161. That analysis points out that the scope of the Justice Department draft protects financial records from unauthorized access "by Congress, Federal or State agents and agencies," whereas S. 14 and S. 2096 protect such records from unauthorized access "by Federal agents or agencies." *Id*.

The draft Justice-Treasury bill, along with its section-by-section analysis, are also in the record of a hearing held by a House of Representatives subcommittee the following week, where Civiletti gave similar testimony. *See Right to Privacy Proposals of the Privacy Protection Study Commission: Hearings on H.R. 10076 Before the Subcomm. on Government Information & Individual Rights of the H. Comm. on Government Operations*, 95th Cong. 256, 274 (1978).

Appellants present two arguments that Congress and its committees are covered by RFPA's definitional phrase "agency or department." First, they point out that in 1955 the Supreme Court ruled a false statement made by a former member of Congress to the Disbursing Office of the House of Representatives was a violation of 18 U.S.C. § 1001 because "department," as used in section 1001, "was meant to describe the executive, *legislative* and judicial branches of the Government." *United States v. Bramblett*, 348 U.S. 503, 509 (1955) (emphasis added).

The Committees respond that an interpretation of "department" in section 1001 is not an authoritative basis for interpreting "department" in RFPA and that the Supreme Court overruled *Bramblett* in *Hubbard v. United States*, 514 U.S. 695, 715 (1995), after characterizing its reading of "department" as "seriously flawed," *id*. at 702. To this latter point, Appellants point out that courts "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990), and "was aware of . . . the judicial background against which it was legislating," *DeKalb County Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 409–10 (2d Cir. 2016) ("*DeKalb*") (brackets and quotation marks omitted), and that the Congress that enacted RFPA in 1978 is assumed to be aware of *Bramblett* and obviously did not legislate in light of *Hubbard*, decided in 1995.

We acknowledge the assumption that Congress legislates with awareness of "existing law," *Miles*, 498 U.S. at 32, and the relevant "judicial background," *DeKalb*, 817 F.3d at 409. The validity of that assumption, however, depends in large part on the context in which it is invoked. *Miles* applied the assumption interpreting the damages provision of the Jones Act, 46 U.S.C. app. § 688. Noting that the Jones Act incorporated the recovery provisions of the older Federal Employers' Liability Act ("FELA"), the Supreme Court was willing to assume that Congress likely intended to adopt for the Jones Act the judicial gloss that the Court had placed on the damages provision of FELA, limiting it to pecuniary loss. *See Miles*, 498 U.S. at 32. "When Congress passed the Jones Act, the [Court's] gloss on FELA, and the hoary tradition behind it, were well established. Incorporating FELA unaltered into the Jones Act, Congress must have intended to incorporate the pecuniary limitation on damages as well." *Id*.

*DeKalb* applied the assumption more elaborately in determining which statute of repose applied to a suit under section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). We had previously applied a three-year limitations period in *Ceres Partners v. GEL Associates*, 918 F.2d 349 (2d Cir. 1990). Thereafter, Congress enacted the Sarbanes-Oxley Act of 2002, extending to five years the

limitations period for some implied private causes of action, but not the sort of action implied by section 14(a). *See DeKalb*, 817 F.3d at 398. We concluded:

> Congress must have known that, by extending only the statute of repose applicable to private rights of action that involve a claim of fraud, deceit, manipulation, or contrivance, the statutes of repose applicable to Section 14(a) would remain intact. And from this knowledge, we conclude that Congress affirmatively intended to preserve them. We therefore hold that the same three-year statutes of repose that we applied to Section 14 in *Ceres* . . . still apply to Section 14(a) today.

*Id*. at 409–10 (quotation marks, brackets, and footnotes omitted).

We encounter no circumstances comparable to *Miles* or *DeKalb* in the pending appeal. Whatever force might be given to the assumption that Congress enacted RFPA with awareness of *Bramblett* is thoroughly undermined by the clear indicators to the contrary from the text and legislative history we have recounted.[26]

The second argument of Appellants reminds us that in an earlier time, the word "department" was famously used to refer to what is now called a "branch" of the federal government. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177

---

[26] Even if Congress had *Bramblett* in mind, that decision based its interpretation of "department" on the "development, scope and purpose of" the statute at issue in that case. 348 U.S. at 509. RFPA does not share any of the same historical development as section 1001, and because the Court's decision was not based on the text of that section, there is no reason to think that Congress, when enacting RFPA, believed that *Bramblett*'s interpretation would extend to other uses of the word "department."

(1803) (Little, Brown & Co. 1855);[27] *see also* James Madison, Speech in the First Congress (June 17, 1789), *in* 5 *The Writings of James Madison* 395, 398 (Gaillard Hunt ed., 1904) (referring to the "three great departments of Government"). *Hubbard*, although not known to the Congress enacting RFPA, provides important guidance for us when the Supreme Court states that "while we have occasionally spoken of the three branches of our Government, including the Judiciary, as 'departments,'" *Hubbard*, 514 U.S. at 699 (brackets omitted) (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 500 (1867)), "that locution is not an ordinary one. Far more common is the use of 'department' to refer to a component of the Executive Branch," *id*.

Considering all of the parties' arguments,[28] we conclude that RFPA does not apply to Congress.

---

[27] I include the publisher in citations to decisions in the nominative reports because of slight variations among the versions of 19th century publishers. *See* Jon O. Newman, *Citators Beware: Stylistic Variations in Different Publishers' Versions of Early Supreme Court Opinions*, 26 J. Sup. Ct. Hist. 1 (2001).

[28] Each side makes opposing arguments based on section 3412(d) of RFPA, which provides: "Nothing in this chapter shall authorize the withholding of information by any officer or employee of a supervisory agency [defined at section 3401(7)] from a duly authorized committee or subcommittee of the Congress." Appellants contend that "[i]f congressional subpoenas were never intended to come within the statute's scope, there would be no reason to include this provision." Br. for Appellants at 42. The Committees respond that this provision concerns transfers of documents pursuant to section 3412(a), that it makes clear that the requirements applicable when an agency or department obtains documents from a financial institution also apply to transfers to another agency or department, and that "Congress emphasized, however, that these transfer provisions—like RFPA's other requirements—did not apply to Congress." Br. for Committees at 53.

B. Statutory Claim—26 U.S.C. § 6103

The request for tax returns of named individuals and entities in the Deutsche Bank Subpoenas encounters a possible statutory claim under 26 U.S.C. § 6103. *See* Deutsche Bank Subpoenas ¶ 1(vi)(e)(7), J. App'x 39. Because of that request and because the parties had not said anything about tax returns in their briefs, we asked the Banks at oral argument whether they had in their possession tax returns within the coverage of the subpoenas. The Banks offered reasons why they could not then respond to the question.

On August 26, we ordered the Banks to inform the Court whether either one has in its possession any tax returns of the individuals or entities named in paragraph 1 of the subpoenas received from the Committees.[29] On August 27,

---

Each side also makes opposing arguments based on section 3413(j) of RFPA, which provides: "This chapter shall not apply when financial records are sought by the Government Accountability Office ['GAO'] pursuant to an authorized proceeding, investigation, examination or audit directed at a government authority." Appellants contend that, because GAO is within the Legislative Branch, "if . . . RFPA is limited to the [E]xecutive [B]ranch, then there was no need to provide any exemption for the GAO." Br. for Appellants at 43. The Committees respond that this provision "differentiates GAO from 'a government authority' and thus supports the opposite conclusion: GAO may obtain financial records in its proceedings or investigations that are '*directed at* a government authority.'" Br. for Committees at 53 n.24 (emphasis in original).

We deem none of these arguments persuasive, especially in light of the textual and legislative history support for our conclusion, explained above, that RFPA does not apply to Congress.

[29] No. 19–1540, Dkt. No. 156 (Aug. 26, 2019). On August 27, we entered an Order informing the Banks that if they filed an unredacted letter under seal, a redacted version of the letter served on the Committees should be served on Appellants and filed on the public docket. *Id.*, Dkt. No. 157 (Aug. 27, 2019).

Deutsche Bank submitted a redacted letter stating that it has in its possession some tax returns responsive to the subpoenas, with the names of the taxpayers redacted,[30] and submitted under seal an unredacted letter identifying the taxpayers.[31] On the same day, Capital One submitted a letter stating that it did not possess any tax returns responsive to the subpoena it received.[32]

Deutsche Bank's filing of an unredacted letter under seal precipitated motions by various news organizations for leave to intervene and to seek unsealing of the unredacted letter.[33] On Sept. 18, we ordered the parties to respond to those motions.[34] On Sept. 27, the parties filed their responses.[35] On Oct. 4, the Media Coalition filed a reply memorandum.[36] On Oct. 10, we granted the motions to intervene and denied the motions to unseal. *See Trump v. Deutsche Bank*, No. 19–1540, 2019 WL 5075948 (2d Cir. Oct. 10, 2019).

Also at oral argument, we asked the Committees whether their subpoenas were in compliance with 26 U.S.C. § 6103(f), which imposes some limits on

---

[30] *Id.*, Dkt. No. 161 (Aug. 27, 2019).

[31] *See* Letter from Raphael A. Prober, counsel for Deutsche Bank, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 160 (Aug. 27, 2019).

[32] *See* Letter from James A. Murphy, counsel for Capital One, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 165 (Aug. 27, 2019).

[33] No. 19–1540, Dkt. Nos. 168 (Sept. 11, 2019), 181 (Sept. 18, 2019).

[34] *Id.*, Dkt. No. 180 (Sept. 18, 2019).

[35] *Id.*, Dkt. Nos. 184, 186, 188, 190 (Sept. 27, 2019).

[36] *Id.*, Dkt. No. 193 (Oct. 4, 2019).

disclosure of tax returns. The Committees partially responded and offered to submit a fuller explanation by letter. On August 27, the Committees submitted a letter stating that the application of section 6103 depends on how the Banks obtained the returns.[37] On August 29, Appellants submitted a letter stating, among other things, that the Committees have no authority to request the tax returns.[38]

Section 6103(a) of the Internal Revenue Code provides: "**(a) General rule.**— Returns and return information shall be confidential . . . ." Sections 6103(c)–(o) provide several exceptions to the general requirement of confidentiality. Subsection 6103(f)(3) makes a specific exception for committees of Congress. It provides:

> "**(3) Other committees.**—Pursuant to an action by, and upon written request by the chairman of, a committee of the Senate or the House of Representatives (other than a committee specified in paragraph (1)) specially authorized to inspect any return or return information by a resolution of the Senate or the House of Representatives . . . the Secretary shall furnish such committee, or a duly authorized and designated subcommittee thereof, sitting in closed executive session, with any return or return information which such resolution authorizes the committee or subcommittee to inspect. Any resolution described in this paragraph shall specify the purpose for which the return or return information is to be furnished and that

---

[37] *See* Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 158 (Aug. 27, 2019).

[38] *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 166 (Aug. 29, 2019).

such information cannot reasonably be obtained from any other source."

26 U.S.C. § 6103(f)(3).[39]

Thus, Congress has protected the confidentiality of income tax returns, subject to several exceptions, and specified how such returns may be obtained by a committee of Congress.

Appellants contend that disclosure is prohibited (or, as they phrase it, that the Committees "have no jurisdiction to request tax returns"[40]) because the requirements of the subsection have not been met. They point out that the House has not passed a resolution specifically authorizing the Committees to inspect tax returns, specifying the purpose for which the returns are sought, or specifying that the information cannot reasonably be obtained from other sources. They also suggest that we need not resolve the issue now, but should leave it for resolution on remand.

Because the Deutsche Bank Subpoenas require production of tax returns and the motion for a preliminary injunction to prohibit compliance has been

---

[39] The committees specified in paragraph (1) of section 6103(f) are the House Committee on Ways and Means, the Senate Committee on Finance, and the Joint Committee on Taxation. § 6103(f)(1). The Code defines "Secretary" as "the Secretary of the Treasury or his delegate." § 7701(a)(11)(B).

[40] *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals at 2, No. 19–1540, Dkt. No. 166 (Aug. 29, 2019).

denied by the District Court, the absence of a ruling on production of the returns risks their disclosure to the Committees. We therefore believe that some ruling must be made.

The Committees do not dispute that they have not met the requirements of section 6103(f), but they contend that the provision does not apply to any tax returns in the possession of Deutsche Bank unless the bank obtained them from the IRS.

The text of section 6103 does not unambiguously resolve the dispute. In addition to citing the requirements of section 6103(f), Appellants rely on section 6103(a). It states that tax returns "shall be confidential," and that "except as authorized by [the Internal Revenue Code]" no person within three specified categories "shall disclose any return . . . obtained by him . . . in connection with his service" within any of the three categories. These include employees of the United States, employees of a state or various local agencies, and those who obtained access to a return pursuant to various subsections of section 6103(a). § 6103(a)(1)–(3).

If the introductory clause of section 6103(a) is a blanket protection of the confidentiality of tax returns, then it prohibits disclosure of the returns in the

possession of Deutsche Bank. But if that clause is to be read in conjunction with the rest of section 6103(a), then the clause means only that the returns are protected from disclosure by anyone within the three categories, and it does not prohibit disclosure in the pending appeal because Deutsche Bank is not within any of those categories. Arguably limiting the coverage of section 6103(a) is section 6103(b). It defines "return" "[f]or purposes of this section" as a return "which is filed with the Secretary." § 6103(b)(1). That provision could mean either the document or digital file in the possession of the Secretary (including the IRS), which Deutsche Bank does not have, or a copy of a paper or digitized return that has been submitted to the Secretary, which Deutsche Bank does have.

Another provision of section 6103 also creates ambiguity as to its meaning. Section 6103(f) states that a congressional committee may obtain a tax return "from the Secretary" pursuant to a House resolution meeting specified requirements, as set forth above. This provision could mean either that the only way a committee may obtain a tax return is to seek it from the Secretary and comply with the requirements of section 6103(f), or it could mean that those requirements apply only when a committee seeks a return from the Secretary and do not apply when a committee seeks a return from anyone else, such as Deutsche Bank.

Case law on these possible interpretations has evoked various rulings and statements. The Seventh Circuit has ruled that the introductory clause of section 6103(a) is not a blanket protection of confidentiality, but protects only against disclosure by those described in subsections 6103(a)(1)–(3). *Hrubec v. National Railroad Passenger Corp.*, 49 F.3d 1269 (7th Cir. 1995). "The ban on disclosure appears in the last, dangling, unnumbered portion of § 6103(a), not in the introductory phrase, and the ban is linked to the scope of identified subsections." *Id*. at 1270–71. *Hrubec* found no violation of section 6103 by Amtrak employees who obtained copies of other employees' tax returns from the IRS, but not as a result of a request covered by any of the categories identified in section 6103(a).[41] The Ninth Circuit has also given a narrow interpretation to section 6103. In *Stokwitz v. United States*, 831 F.2d 893 (9th Cir. 1987), it ruled that "Section 6103 establishes a comprehensive scheme for controlling the release *by the IRS* of information received from taxpayers to discrete identified parties." *Id*. at 895 (emphasis in original); *accord Lomont v. O'Neill*, 285 F.3d 9, 14–15 (D.C. Cir. 2002); *Baskin v. United States*, 135 F.3d 338, 342 (5th Cir. 1998); *Ryan v. United States*, 74 F.3d 1161, 1163 (11th Cir. 1996). *Stokwitz* found no violation of section 6103 where

---

[41] The returns had been obtained by someone's forgery of an application for them. *See Hrubec v. National Railroad Passenger Corp.*, 778 F. Supp. 1431, 1433 (N.D. Ill. 1991).

employees of the United States Navy seized from a taxpayer's files copies of tax returns, even though the employees were covered by subsection 6103(a)(1). The Court relied on the definition of "tax return" in section 6103(b), *see id.* at 895–96 ("[T]he statutory definitions of 'return' and 'return information' to which the entire statute relates, confine the statute's coverage to information that is passed through the IRS."), and noted that implementing "Treasury regulations . . . are exclusively concerned with disclosure by the IRS," *id.* at 896 (citing Treas. Regs. §§ 301.6103(a)-1 to (p)(7)-1 (1986)).

Other courts have expressed different views. In *National Treasury Employees Union v. Federal Labor Relations Authority*, 791 F.2d 183 (D.C. Cir. 1986), the D.C. Circuit referred to section 6103(a) as a "general rule that 'returns and return information shall be confidential.'" *Id.* at 183 (brackets omitted) (quoting § 6103(a)). The Court's main point, however, was that the disclosure, which had been made by IRS employees, had not been made in compliance with subsection 6103(l)(4)(A), and even that point, as well as the "general rule" statement, were dicta because the Court's holding was that the employees should not have been disciplined.

A district court in our Circuit has stated that a board licensing plumbers violated section 6103 by making disclosure of a license applicant's tax forms a condition of obtaining a license. *See Russell v. Board of Plumbing Examiners*, 74 F. Supp. 2d 339 (S.D.N.Y. 1999) ("The Board being unable to get the copies directly from the Treasury should not be permitted to do so indirectly by coercion . . . ."), *aff'd*, 1 F. App'x 38 (2d Cir. 2001). The District Court's view, however, was at most an alternate holding on an issue that the Court acknowledged had not been briefed, *see id*. at 348, and our affirmance in a non-precedential summary order made no reference to the issue, which had not been asserted as a ground for review, *see* Br. & Reply Br. for Appellants, *Russell v. Board of Plumbing Examiners*, 1 F. App'x 38 (2d Cir. 2001) (No. 99-9532).

We agree with the Seventh Circuit that section 6103(a) limits its prohibition against disclosure of tax returns to returns requested from the three categories of persons identified in subsections 6103(a)(1)–(3). There remains the possibility, however, that subsection 6103(f)(3), applicable to requests for tax returns by congressional committees other than those concerned explicitly with taxes, provides the exclusive means for such committees to obtain returns. The text of subsection 6103(f)(3) refers to committee requests "to the Secretary." We agree

with the Ninth Circuit that the plain language of the provision reflects Congress's

purpose in enacting section 6103, which "was to curtail loose disclosure practices

by the IRS." *Stokwitz*, 831 F.2d at 894. Because there is no claim by Appellants that

Deutsche Bank obtained from the IRS any returns requested by the Committees,

neither subsection 6103(f)(3), nor section 6103 as a whole, precludes their

production to the Committees.

Appellants also contend that production of tax returns is prohibited by the

RFPA and the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999).

As we have ruled, however, RFPA does not apply to Congress. Gramm-Leach-

Bliley is also no bar to production of tax returns because it explicitly permits

disclosure of personal information "to comply with a . . . subpoena . . . by Federal

. . . authorities." 15 U.S.C. § 6802(e)(8).

With respect to tax returns, the oral argument of this appeal precipitated

further procedural developments, detailed in *Trump v. Deutsche Bank*, No. 19–1540,

2019 WL 5075948 (2d Cir. Oct. 10, 2019) (order granting news organizations'

motions to intervene and denying their motions to unseal). Ultimately, Deutsche

Bank informed us in an August 27, 2019, letter[42] that it had two tax returns within the coverage of the Committees' subpoenas and submitted the names of the two taxpayers under seal.

If any tax returns in the possession of Deutsche Bank were those of the Lead Plaintiff, we would have to consider whether their production to the Committees might encounter the objection that it would distract the Chief Executive in the performance of official duties. That issue need not be resolved, however, because Deutsche Bank informed us, in its response to the motions of news organizations to unseal Deutsche Bank's letter of August 27, that the only tax returns in its possession within the coverage of the subpoenas are not those of the Lead Plaintiff.

Disclosure of tax returns in the possession of Deutsche Bank in response to the Committees' subpoenas will not violate section 6103, and the fact that, when requested by news organizations, we did not unseal the names of the taxpayers whose returns are in the possession of Deutsche Bank is not a reason to exclude those returns from Deutsche Bank's compliance with the subpoenas.

---

[42] *See* Letter from Letter from Raphael A. Prober to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 161 (redacted version) (Aug. 27, 2019); *id.*, Dkt. No. 165 (unredacted version filed under seal) (Aug. 27, 2019).

C. Constitutional Claim

Appellants' constitutional claim does not assert any constitutionally based privilege that might protect their financial records from production by the Banks to the Committees, such as the privileges secured in the Bill of Rights. *See Watkins*, 354 U.S. at 198 (recognizing "the restraints of the Bill of Rights upon congressional investigations"). Instead, Appellants contend that the Constitution places limits on the power of Congress to investigate, that the Committees' subpoenas to the Banks exceed those limits, and that they have a right to prevent disclosure of documents in response to subpoenas beyond Congress's power of investigation.

The subpoenas are surely broad in scope. Illustrating the scope, Appellants specifically call our attention to the following requests in the Committees' subpoenas to Deutsche Bank for the following:

> "any document related to account applications, opening documents, KYC [know your customer], due diligence, and closing documents";
> "any monthly or other periodic account statement";
> "any document related to any domestic or international transfer of funds in the amount of $10,000 or more";
> "any summary or analysis of domestic or international account deposits, withdrawals, and transfers";
> "any document related to monitoring for, identifying, or evaluating possible suspicious activity";

"any document related to any investment, bond offering, line of credit, loan, mortgage, syndication, credit or loan restructuring, or any other credit arrangement."

Deutsche Bank Subpoenas ¶¶ 1(i)–(vi), J. App'x 37–38.

The documents sought are those of the Lead Plaintiff and his three oldest children, and "members of their immediate family," defined to include child, daughter-in-law, and son-in-law, among others, and a number of entities affiliated with the Lead Plaintiff and the Trump Organization. *Id.* at 37 ¶ 1, 47 ¶ 5. The documents concern financial transactions of the named individuals and their affiliated entities. The time frame for which most of the documents are sought is July 19, 2016, to the present for the Capital One subpoena and January 1, 2010, to the present for the Deutsche Bank subpoenas, but there is no time limit for two categories of documents sought by all three subpoenas. *See id.* at 37, intro., 52, intro. These categories include documents related to account openings, the names of those with interests in identified accounts, and financial ties between the named individuals and entities and any foreign individual, entity, or government. *See id.* at 37 ¶ 1(i), 41–42 ¶ 6(i), 52 ¶¶ 1(i), (ii).

*Constitutional investigative authority of Congress.* An important line of Supreme Court decisions, usually tracing back to *McGrain v. Daugherty*, 273 U.S.

135 (1927), has recognized a broad power of Congress and its committees to obtain

information in aid of its legislative authority under Article I of the Constitution.

*See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 (1975); *Barenblatt*,

360 U.S. at 111; *Watkins*, 354 U.S. at 187; *Quinn*, 349 U.S. at 160; *Sinclair v. United*

*States*, 279 U.S. 263, 297 (1929), *overruled on other grounds by United States v. Gaudin*,

515 U.S. 506, 519 (1995). "[T]he power of inquiry—with process to enforce it—is an

essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S.

at 174. "The scope of the power of inquiry, in short, is as penetrating and far-

reaching as the potential power to enact and appropriate under the Constitution."

*Barenblatt*, 360 U.S. at 111. "[T]he power to investigate is inherent in the power to

make laws because 'a legislative body cannot legislate wisely or effectively in the

absence of information respecting the conditions which the legislation is intended

to affect or change.'" *Eastland*, 421 U.S. at 504 (brackets omitted) (quoting *McGrain*,

273 U.S. at 175). "The power of the Congress to conduct investigations . . .

encompasses inquiries concerning the administration of existing laws as well as

proposed or possibly needed statutes." *Watkins*, 354 U.S. at 187.[43]

---

[43] Courts have recognized an additional, though less clearly delineated, source of Congress's investigative authority, namely, Congress's "informing function." The Supreme Court has explained that although Congress cannot "expose for the sake of exposure," it has the power "to inquire into and publicize corruption, maladministration or inefficiency in agencies of

As the Committees recognize, however, Congress's constitutional power to investigate is not unlimited. The Supreme Court has identified several limitations. One concerns intrusion into the authority of the other branches of the government. In *Kilbourn v. Thompson*, 103 U.S. 168 (1880), which the Supreme Court has identified as the first case in which the Court considered a challenge to "the use of compulsory process as a legislative device," *Watkins*, 354 U.S. at 193, the Court ruled that Congress's power to compel testimony was unconstitutionally used because the House of Representatives had "assumed a power which could only be properly exercised by another branch of the government," in that case, the Judicial Branch, *Kilbourn*, 103 U.S. at 192.[44]

In *Quinn*, the Supreme Court identified other limits. The power to investigate "must not be confused with any of the powers of law enforcement."

---

the Government" in order to inform the public "concerning the workings of its government." *Watkins*, 354 U.S. at 200 & n.33; *see Rumely*, 345 U.S. at 43 ("'It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. . . . The informing function of Congress should be preferred even to its legislative function.'") (quoting Woodrow Wilson, *Congressional Government: A Study in American Politics* 303 (1913)). We need not consider this potential source of investigative authority because we conclude that the Committees issued the subpoenas to advance valid legislative purposes.

[44] Kilbourn had been imprisoned by the sergeant-at-arms of the House of Representatives for contempt by refusing to respond to a House committee's inquiries concerning matters that were then pending in a federal bankruptcy court. As the Supreme Court later explained in *McGrain*, the bankruptcy was a matter "in respect to which no valid legislation could be had" because the case was "still pending in the bankruptcy court" and "the United States and other creditors were free to press their claims in that proceeding." 273 U.S. at 171.

349 U.S. at 161. "Nor does it extend to an area in which Congress is forbidden to legislate." *Id*. "Still further limitations on the power to investigate are found in the specific individual guarantees of the Bill of Rights . . . ." *Id.* And, most pertinent to the pending appeal, the power to investigate "cannot be used to inquire into private affairs unrelated to a valid legislative purpose." *Id*.

The principal argument of Appellants is that compliance with the Committees' subpoenas should be preliminarily enjoined because the subpoenas seek information concerning their private affairs. Unquestionably, disclosure of the financial records sought by the Committees will subject Appellants' private business affairs to the Committees' scrutiny. However, inquiry into private affairs is not always beyond the investigative power of Congress. In *Quinn*, the Court was careful to state that the power to investigate "cannot be used to inquire into private affairs *unrelated to a valid legislative purpose*." *Id*. (emphasis added). In *Barenblatt*, the Court stated a similar qualification: "Congress may not constitutionally require an individual to disclose . . . private affairs except in relation to [a valid legislative] purpose." 360 U.S. at 127.

So, although the Court had made clear before *Barenblatt* that there is "no congressional power to expose for the sake of exposure," *Watkins*, 354 U.S. at 200,

it has also stated that inquiry into private affairs is permitted as long as the inquiry is related "to a valid legislative purpose," *Quinn*, 349 U.S. at 161; *see Barenblatt*, 360 U.S. at 127. This potential tension between a permissible legislative purpose and an impermissible inquiry for the sake of exposure requires consideration of the role of motive and purpose in assessing the validity of a congressional inquiry.

The Supreme Court has spoken clearly as to motive with respect to a congressional inquiry. Referring to congressional committee members questioning a witness, the Court said, "[T]heir motives alone would not vitiate an investigation which had been instituted by a House of Congress *if that assembly's legislative purpose is being served*." *Watkins*, 354 U.S. at 200 (emphasis added).[45]

---

[45] *Watkins* cites, 354 U.S. at 200 n.34, among other cases, *Eisler v. United States*, 170 F.2d 273 (D.C. Cir. 1948), in which the D.C. Circuit stated, "[D]efense counsel sought to introduce evidence to show that the Committee's real purpose in summoning appellant was to harass and punish him for his political beliefs and that the Committee acted for ulterior motives not within the scope of its or Congress' powers. The lower court properly refused to admit such evidence, on the ground that the court had no authority to scrutinize the motives of Congress or one of its committees." *Id.* at 278–79 (quotation marks and ellipsis omitted).

In *Tenney v. Brandhove*, 341 U.S. 367 (1951), the Supreme Court provided this caution to courts asked to consider legislators' motives: "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Id.* at 378 (footnote omitted).

More than 50 years ago, the Supreme Court candidly recognized the difficulty a court faces in considering how a legislative purpose is to be assessed when a privacy interest is asserted to prevent a legislative inquiry:

> "Accommodation of the congressional need for particular information with the individual and personal interest in privacy is an arduous and delicate task for any court. We do not underestimate the difficulties that would attend such an undertaking."

*Id*. at 198.

*Requirement of identifying legislative purpose*. The first task for courts undertaking this "accommodation" is identification of the legislative purpose to which a congressional investigation is asserted to be related.

> "It is manifest that despite the adverse effects which follow upon compelled disclosure of private matters, not all such inquiries are barred. *Kilbourn v. Thompson* teaches that such an investigation into individual affairs is invalid if unrelated to any legislative purpose."

*Id*. *Watkins* provided further guidance as to how that inquiry as to legislative purpose should at least begin:

> "An essential premise in this situation is that the House or Senate shall have instructed the committee members on what they are to do with the power delegated to them. It is the responsibility of the Congress, in the first instance, to insure that compulsory process is used only in furtherance of a legislative purpose. That requires that the instructions to an investigating committee spell out that group's jurisdiction and purpose with sufficient particularity. Those

51

instructions are embodied in the authorizing resolution. That document is the committee's charter."

*Id*. at 201.

It is not clear whether this passage can be satisfied only by the instruction that the House gives to a committee pursuant to a House rule defining a standing committee's continuing jurisdiction, or whether a specific "authorizing resolution" is required for a committee to undertake an investigation on a particular subject within its jurisdiction. During an argument on July 12 of this year in the Court of Appeals for the District of Columbia Circuit in *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir.), *reh'g en banc denied*, 941 F.3d 1180 (D.C. Cir.), *mandate stayed*, No. 19A545, 2019 WL 6328115 (U.S. Nov. 25, 2019) ("*Trump v. Mazars*"), a challenge to a subpoena issued by the House Committee on Oversight and Reform,[46] the *Mazars* appellants, many of whom are Appellants here, contended that a clear statement from the House authorizing a standing

---

[46] The subpoena challenged in *Mazars* seeks four categories of documents somewhat different from those sought by the subpoenas challenged on this appeal, and seeks the documents for purposes significantly different from the Committees' purposes, as we point out *infra*. The categories are: various financial statements and reports compiled by Mazars USA, LLP, engagement agreements for preparation of such statements and reports, supporting documents used in the preparation of such statements and reports, and memoranda, notes, and communication related to the compilation and auditing of such statements and reports. *See* Decl. of William S. Consovoy, Ex. A at 3, *Trump v. Committee on Oversight and Reform of the United States House of Representatives*, 380 F. Supp. 3d 76 (D.D.C. 2019) (No. 19-cv-01136 (APM)), ECF No. 9-2, *aff'd*, *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019).

committee to investigate not just a particular *subject* but the particular *subpoena*

being challenged was required, at least where the subpoena seeks papers of the

President. *See* Oral Arg. at 8:35, 1:32:15, 2:03:15, *Trump v. Mazars USA, LLP*, No. 19-

5142 (D.C. Cir. July 12, 2019).[47]

Apparently responding to that contention, the House of Representatives on

July 24 adopted a resolution that includes the following language:

> "*Resolved*, That the House of Representatives ratifies and affirms all current and future investigations, as well as all subpoenas previously issued or to be issued in the future, by any standing or permanent select committee of the House, pursuant to its jurisdiction as established by the Constitution of the United States and rules X and XI of the Rules of the House of Representatives, concerning or issued directly or indirectly to—
>
>> (1) the President in his personal or official capacity;
>> (2) his immediate family, business entities, or organizations;
>>
>> . . .
>>
>> (9) any third party seeking information involving, referring, or related to any individual or entity described in paragraphs (1) through (7)."

H.R. Res. 507, 116th Cong. (2019); *see* H.R. Res. 509, 116th Cong. § 3 (2019) ("House

Resolution 507 is hereby adopted.").[48] On July 26, the Committees informed us of

---

[47] Appellants have not made that "clear statement" argument in their briefs in this case.
[48] H.R. Res. 507 disclaims the need for its adoption, stating:

> "Whereas the validity of some of [the pending] investigations and subpoenas [relating to the President] has been incorrectly challenged in Federal court on the grounds that the investigations and subpoenas were not authorized

this resolution.[49]

On July 31, counsel for the *Mazars* appellants made two related arguments to the D.C. Circuit rejecting the significance of Resolution 507.[50] First, he read the passage from *Watkins*, quoted above, to mean that only the House Rules initially outlining a committee's jurisdiction can provide a valid source of authority for a legislative investigation. Second, he contended that two decisions, *United States v. Rumely*, 345 U.S. 41 (1953), and *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963), establish that Resolution 507 came "too late." On August 1, counsel for Appellants in our appeal made the same arguments to our Court.[51]

---

by the full House and lacked a 'clear statement' of intent to include the President, which the President's personal attorneys have argued in Federal court is necessary before the committees may seek information related to the President; and

"Whereas while these arguments are plainly incorrect as a matter of law, it is nevertheless in the interest of the institution of the House of Representatives to avoid any doubt on this matter and to unequivocally reject these challenges presented in ongoing or future litigation."

H.R. Res. 507.

[49] *See* Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 106 (July 26, 2019).

[50] *See* Letter from William S. Consovoy, counsel for President Donald J. Trump, to Mark Langer, Clerk of Court, D.C. Circuit Court of Appeals, *Trump v. Mazars USA, LLP*, No. 19–5142, Doc. No. 1799866 (D.C. Cir. July 31, 2019).

[51] *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 112 (Aug. 1, 2019).

On August 6, the United States filed in the *Mazars* appeal an amicus curiae brief, making additional arguments concerning the alleged deficiency of Resolution 507. We need not set forth those arguments because on August 19 the United States filed an amicus curiae brief in the

Although we agree that there must be sufficient evidence of legislative authorization and purposes to enable meaningful judicial review, Appellants' arguments that seek to limit evidence we may consider are not persuasive. Although *Watkins* examined the authorizing resolutions of the committee whose authority to compel answers to its inquiry was being challenged, *see* 354 U.S. at 201–02 & nn. 35–36, the Supreme Court's opinion reveals that these resolutions are not the only sources to be considered in determining whether a committee's investigation has been validly authorized. As the Court noted, "There are several sources that can outline the 'question under inquiry.'" *Id*. at 209. Among these, the Court mentioned "the remarks of the [committee] chairman or members of the committee, or even the nature of the proceedings themselves." *Id*. Indeed, the Court considered the opening statement of the chairman of the committee before whom the defendant in a criminal contempt proceeding had refused to answer, *see id*. at 209–10, although finding the statement impermissibly vague, *see id*. at 210; *see also Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (statements of committee members relevant to identification of purposes of congressional investigations).

---

pending appeal, making additional arguments concerning Resolution 507 as it relates to the subpoenas in the pending litigation. We consider those arguments *infra*.

*Rumely* does not confine the search for authorization of a valid legislative purpose to a committee's jurisdictional resolution. The Court concluded that the witness's "duty to answer must be judged as of the time of his refusal." *Rumely*, 345 U.S. at 48. Because we regard the time of the Banks' compliance with the subpoenas challenged in this case as the equivalent of the time of the witness's refusal in *Rumely*, that decision is no bar to examining legislative materials existing before such compliance.

Furthermore, the Court's point in *Rumely* was that the scope of the resolution authorizing the committee's investigation could not "be enlarged by subsequent action of Congress." 345 U.S. at 48. In the pending case, the issue with respect to House Resolution 507 is whether this Court, in ascertaining House authorization of the Committees' investigations, can consider evidence that comes after the issuance of the subpoenas. Including House Resolution 507 in our consideration results in no unfairness to the Banks, which have not refused to produce the information requested. Moreover, House Resolution 507 does not suffer from the same "infirmity of *post litem motam*, self-serving declarations" that tainted the *post hoc* debate in *Rumely*, 345 U.S. at 48, because the resolution does not purport to alter either the interpretation of the Committees' jurisdiction or the

56

stated purposes of the Committees' investigations that existed at the time the subpoenas were issued. Rather, the resolution was passed to eliminate any doubt regarding the support of the House for the Committees' investigations.

The D.C. Circuit's decision in *Shelton* states that the time a contempt witness is entitled to know the purpose of a challenged legislative inquiry is "before the subpoena issued." 327 F.2d at 607. Preliminarily, we note that this assertion is dictum; the holding is that the committee's subpoena was invalid because of procedural irregularity in its issuance.[52] *See id*. More important, that dictum conflicts with what the Supreme Court said in *Watkins*. The Court there made clear that to satisfy the due process objection arising from a contempt imposed for refusing to answer a committee's question insufficiently shown to be related to a valid legislative purpose, the purpose could be identified as late as immediately before the witness was required to answer. "Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the

---

[52] The D.C. Circuit explained that the relevant Senate resolution "imposes on the Subcommittee itself" the "function of calling witnesses," and that "the whole function of determining who the witnesses would be was de facto delegated to the Subcommittee counsel." *Shelton*, 327 F.2d at 606.

subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto." *Watkins*, 354 U.S. at 214–15.

We therefore do not confine our search for the Committees' purposes to the House Rules alone, nor do we exclude Resolution 507 from our inquiry.

*Identifying the Committees' legislative purpose*. We next consider the "legislative purpose" to which the Committees assert their investigations are "related" and "the weight to be ascribed to[] the interest of the Congress in demanding disclosures" in order to determine whether "a public need" for such investigation "overbalances any private rights affected." *Id*. at 198.

Our consideration begins with the Constitution, which assigns to each house of Congress authority to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. In 2019, Congress adopted the Rules of the House of Representatives. *See* H.R. Res. 6, 116th Cong. (2019); Rules of the House of Representatives, 116th Cong. (prepared by Karen L. Haas, Clerk of the House of Representatives, Jan. 11, 2019) (hereinafter "H. Rules"). House Rule X establishes the standing committees of the House, including the Financial Services Committee and the Permanent Select Committee on Intelligence. *See* H. Rules X(2)(h), X(11). Rule X assigns to the Financial Services Committee jurisdiction over bills concerning, among other

things, banks and banking, international finance, and money and credit, *see* H. Rule X(1)(h)(1), (h)(5), (h)(7), and assigns to the Intelligence Committee jurisdiction over bills concerning, among other things, the Nation's intelligence agencies and their intelligence and intelligence-related activities, *see* H. Rule X(11)(b)(1)(A), (B).

Rule X also assigns to all of the standing committees "general oversight responsibilities . . . to assist the House in its analysis, appraisal, and evaluation of (A) the application, administration, execution, and effectiveness of Federal laws; and (B) conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation." H. Rule X(2)(a)(1). In addition, Rule X assigns to the Intelligence Committee "[s]pecial oversight functions" to "review and study on a continuing basis laws, programs, and activities of the intelligence community." H. Rule X(3)(m).

House Rule XI provides: "Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under [R]ule X." H. Rule XI(1)(b)(1). Rule XI also provides:

> "For the purpose of carrying out any of its functions and duties under this rule and [R]ule X . . . a committee or subcommittee is authorized . . . to require, by subpoena . . . the production of such . . . records . . . as it considers necessary."

H. Rule XI(2)(m)(1)(B).

On March 13, 2019, the House of Representatives adopted a resolution stating, among other things, that the House "supports efforts to close loopholes that allow corruption, terrorism, and money laundering to infiltrate our country's financial system." H.R. Res. 206, 116th Cong. (Mar. 13, 2019).

On April 12, 2019, the House Committee on Oversight and Reform issued a report summarizing the subjects that several committees planned to investigate during the 116th Congress. *See* H.R. Rep. No. 116-40 (2019). Because the date of this report is one day after issuance of the subpoenas challenged in this case, we note that the text of the report makes clear that the plans submitted by the committees had been received prior to the date the report was issued.[53]

The plan submitted by the Financial Services Committee includes as its purposes: "examining financial regulators' supervision of the banking, thrift and credit union industries for safety and soundness and compliance with laws and

---

[53] The report explains that under House Rule X, the Oversight Committee "is to review the various plans and, in consultation with the Speaker, the Majority Leader, and the Minority Leader, report to the House the oversight plans along with any recommendations that the House leadership and the Committee may have to ensure effective coordination. Pursuant to this rule, the Committee on Oversight and Reform has reviewed and consulted with House leadership about the oversight plans of the standing House committees for the 116th Congress." H.R. Rep. No. 116-40 at 2.

regulations," *id*. at 78; "the implementation, effectiveness, and enforcement of anti-money laundering/counter-financing of terrorism laws and regulations," *id*. at 84 (abbreviation omitted); and "the risks of money laundering and terrorist financing in the real estate market," *id*. at 85.

The Chair of the Financial Services Committee, Representative Maxine Waters, has identified a principal purpose of that committee's investigation. "The movement of illicit funds throughout the global financial system raises numerous questions regarding the actors who are involved in these money laundering schemes and where the money is going." 165 Cong. Rec. H2697, H2698 (daily ed. Mar. 13, 2019) (statement of Rep. Waters in support of H.R. Res. 206). Linking the Committee's inquiries to Appellants, she explained that her concerns are "precisely why the Financial Services Committee is investigating the questionable financing provided to President Trump and [t]he Trump Organization by banks like Deutsche Bank to finance its real estate properties." *Id*. In her statement, Rep. Waters noted that Deutsche Bank was fined for its role in a $10 billion money-laundering scheme, 165 Cong. Rec. at H2698, and the Committees note in their brief, Br. for Intervenors at 11, that Capital One agreed to pay a fine of $100 million for failing to correct deficiencies in its Bank Secrecy Act and anti-money-

laundering programs, *see Capital One, N.A.*, Enforcement Action No. 2018-080, 2018

WL 5384428, at *1–2 (O.C.C. Oct. 23, 2018).

The Financial Services Committee has held hearings on these matters,[54] and

considered bills to combat financial crimes, such as money laundering.[55]

The Chair of the Intelligence Committee has identified several purposes of

that committee's investigation. The committee is investigating "[t]he scope and

scale of the Russian government's operations to influence the U.S. political

process"; "[t]he extent of any links and/or coordination between the Russian

government, or related foreign actors, and individuals associated with Donald

Trump's campaign, transition, administration, or business interests, in furtherance

of the Russian government's interests"; "[w]hether any foreign actor has sought to

compromise or holds leverage, financial or otherwise, over Donald Trump, his

family, his business, or his associates"; and "[w]hether President Trump, his

---

[54] *Implementation of FinCEN's Customer Due Diligence Rule—Regulator Perspective: Hearing Before the Subcomm. on Terrorism & Illicit Finance of the H. Comm. on Financial Services*, 115th Cong. (2018); *Examining the BSA/AML Regulatory Compliance Regime: Hearing Before the Subcomm. on Financial Institutions & Consumer Credit of the H. Comm. on Financial Services*, 115th Cong. (2017).

[55] *See* Corporate Transparency Act of 2019, H.R. 2513, 116th Cong. (bill to reform corporate beneficial ownership disclosures and increase transparency); COUNTER Act of 2019, H.R. 2514, 116th Cong. (bill to strengthen the Bank Secrecy Act and anti-money-laundering laws); Vladimir Putin Transparency Act, H.R. 1404, 116th Cong. (as passed by House, Mar. 12, 2019) (bill to require Executive Branch agencies to submit assessment to Congress regarding financial holdings of Russian President Vladimir Putin and top Kremlin-connected oligarchs).

family, or his associates are or were at any time at heightened risk of, or vulnerable to, foreign exploitation, inducement, manipulation, pressure, or coercion." Press Release, House Permanent Select Committee on Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6, 2019).[56]

Linking these investigations to Appellants, the Committees cite public reports indicating that Deutsche Bank has extended loans to the Lead Plaintiff totaling more than $2 billion[57] and that his 2017 financial disclosure report showed a liability of at least $130 million to Deutsche Bank.[58] At oral argument, counsel for the Committees represented, without contradiction by Appellants, that Deutsche Bank is the only bank willing to lend to the Lead Plaintiff. *See* Oral Arg. Tr. at p. 36, ll. 5–18.

On this appeal, the Committees contend that the Intelligence Committee's investigations "will inform numerous legislative proposals to protect the U.S.

---

[56] https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447.

[57] David Enrich, *Deutsche Bank and Trump: $2 Billion in Loans and a Wary Board*, N.Y. Times, Mar. 18, 2019, https://www.nytimes.com/2019/03/18/business/deutsche-bank-donald-trump/html.

[58] Donald J. Trump, President, Executive Branch Personnel Public Financial Disclosure Report for 2017 (Office of Government Ethics Form 278e) at 45 (May 15, 2018).

political process from the threat of foreign influence and strengthen national security." Br. for Committees at 18.[59]

All of the foregoing fully identifies "the interest[s] of the Congress in demanding disclosures," as *Watkins* requires. 354 U.S. at 198. The Committees' interests concern national security and the integrity of elections, and, more specifically, enforcement of anti-money-laundering/counter-financing of terrorism laws, terrorist financing, the movement of illicit funds through the global financial system including the real estate market, the scope of the Russian government's operations to influence the U.S. political process, and whether the Lead Plaintiff was vulnerable to foreign exploitation. *Watkins* also requires that a legislative inquiry must in fact be related to a legislative purpose.[60] *See id*. The Committees have fully satisfied the requirements of *Watkins.*

---

[59] The Committees cite as examples the following bills: Duty to Report Act, H.R. 2424, 116th Cong. (2019) (bill to require campaign officials to notify law enforcement if offered assistance by foreign nationals and to report all meetings with foreign agents); KREMLIN Act, H.R. 1617, 116th Cong. (as passed by House, Mar. 12, 2019) (bill to require Director of National Intelligence to submit to Congress intelligence assessments of Russian intentions relating to North Atlantic Treaty Organization and Western allies); Strengthening Elections Through Intelligence Act, H.R. 1474, 116th Cong. (2019) (bill to require an intelligence threat assessment prior to every federal general election); For the People Act of 2019, H.R. 1, 116th Cong. (as passed by House, Mar. 8, 2019) (bill to improve election security and oversight and provide for national strategy and enforcement to combat foreign interference).

[60] The Court had previously said in *Quinn* that the power to investigate "cannot be used to inquire into private affairs *unrelated to a valid legislative purpose*." 349 U.S. at 161 (emphasis added).

We conclude our consideration of the Committees' identification of valid legislative purposes by noting the significantly different purposes that were identified by the House Committee on Oversight and Reform in the *Trump v. Mazars* case in the District of Columbia,[61] to which we previously alluded.[62] The four subject matters being investigated by that committee, set out in the margin,[63] all explicitly concerned whether the President was in compliance with legal

---

[61] After the D.C. Circuit's decision in *Mazars*, Appellants and the Committees sent letters to this Court, reporting and commenting on that decision. *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 202 (Oct. 14, 2019); Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 201 (Oct. 11, 2019). In view of the D.C. Circuit's ruling affirming the denial of an injunction to prohibit compliance with the subpoena there challenged, Appellants' letter stating that "the *Mazars* majority agreed that the subpoenas here are unconstitutional" presses the limits of advocacy. The Committees' letter states, "This Court should join the D.C. Circuit in upholding the validity of the subpoenas at issue here."

[62] *See* footnote 46, p. 52.

[63] As stated by Chairman Cummings:

"The Committee has full authority to investigate [1] whether the President may have engaged in illegal conduct before and during his tenure in office, [2] to determine whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions, [3] to assess whether he is complying with the Emoluments Clauses of the Constitution, and [4] to review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities. The Committee's interest in these matters informs its review of multiple laws and legislative proposals under our jurisdiction, and to suggest otherwise is both inaccurate and contrary to the core mission of the Committee to serve as an independent check on the Executive Branch."

Memorandum from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform 4 (Apr. 12, 2019).

requirements. Nevertheless, Judge Tatel's opinion for the *Mazars* majority concluded that the Oversight Committee, in issuing the challenged subpoena, "was engaged in a 'legitimate legislative investigation,' rather than an impermissible law-enforcement inquiry." *Mazars*, 940 F.3d at 732 (quoting *Hutcheson v. United States*, 369 U.S. 599, 618 (1962)) (citation omitted). On the other hand, Judge Rao's dissent contended that because the Oversight Committee was investigating whether the President violated various laws, its "investigations may be pursued exclusively through impeachment."[64] *Id*. at 751.

In the pending appeal, the Committees are not investigating whether the Lead Plaintiff has violated any law. To the extent that the Committees are looking into unlawful activity such as money laundering, their focus is not on any alleged misconduct of the Lead Plaintiff (they have made no allegation of his misconduct); instead, it is on the existence of such activity in the banking industry, the adequacy of regulation by relevant agencies, and the need for legislation.

*Whether legislative purpose "overbalances" private rights.* The Supreme Court can be understood in *Watkins* to have set out a second requirement for courts considering challenges to legislative inquiries.

---

[64] We note that neither the principal nor the reply brief of Appellants mentions the word "impeachment."

"The critical element is the existence of, and the weight to be ascribed to, the interest of the Congress in demanding disclosures from an unwilling witness. We cannot simply assume, however, that every congressional investigation is justified by *a public need that overbalances any private rights affected*. To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy . . . ."

354 U.S. at 198–99 (emphasis added).

When the Court said that it "cannot simply assume, however, that every congressional investigation is justified by a public need that overbalances any private rights affected," *id*. at 198, the inference is available that courts are to determine whether the importance of the legislative interest outweighs an individual's privacy interests.

Three considerations diminish the force of this possible inference. First, we should be hesitant to conclude that the Supreme Court, always sensitive to separation-of-powers concerns, would want courts to make this sort of balancing determination, the outcome of which might impede the Legislative Branch in pursuing its valid legislative purposes. Second, the Court might simply have meant that courts should not "assume" the existence of a legislative purpose, but that the judicial task is at an end once courts find in congressional materials sufficient identification of the valid legislative purposes that Congress or a

committee is pursuing. Third, the Court later cautioned that "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Eastland*, 421 U.S. at 506 (quotation marks omitted). On the other hand, it is not likely that the Court would have described such a minimalist approach as "an arduous and delicate task." *Watkins*, 354 U.S. at 198*.*

Encountering this uncertainty as to the task that *Watkins* has required courts to undertake, we will assume, for the argument, that we should make at least some inquiry as to whether the "public need" to investigate for the valid legislative purposes we have identified "overbalances any private rights affected." That balancing is similar to the comparison of hardships we make in Part IV, one of the factors relevant to two of the preliminary injunction standards.

We conclude that, even if *Watkins* requires balancing after valid legislative purposes have been identified, the interests of Congress in pursuing the investigations for which the challenged subpoenas were issued substantially "overbalance" the privacy interests invaded by disclosure of financial documents, including the non-official documents of the Lead Plaintiff. "[T]he weight to be ascribed to" the public need for the investigations the Committees are pursuing is

of the highest order. The legislative purposes of the investigations concern national security and the integrity of elections, as detailed above. By contrast, the privacy interests concern private financial documents related to businesses, possibly enhanced by the risk that disclosure might distract the President in the performance of his official duties.

*Whether the subpoenas seek information related to legislative purposes.* The remaining issue is whether the information sought by the subpoenas is sufficiently related to the identified legislative purposes supporting the Committees' investigations, or whether the subpoenas are overbroad, as Appellants contend. Their challenge proceeds along three lines: (1) a procedural objection concerning the District Court, (2) several general substantive objections to the entire scope of the subpoenas, and (3) a more focused substantive objection to several specific categories of information sought by the subpoenas.

*Procedural objection—District Court's not requiring negotiation.* Appellants contend that the District Court erred procedurally by not "send[ing] the parties back to the negotiating table" to attempt to narrow the scope of the subpoenas. Br. for Appellants at 29. Judge Livingston favors that disposition. Part. Diss. Op. at 11, 56. Indeed, that is an additional point of her partial dissent, which takes no

position on the merits of any of Appellants' claims, deferring decision until such negotiation occurs. Judge Livingston also favors a total remand for further development of the record.

Appellants cite two instances where courts have had at least partial success in encouraging such negotiation. *See AT&T II*, 567 F.2d at 124–25; *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 39–40 (D.D.C. 2018). Both cases arose in significantly different circumstances, and neither one requires a total remand here. The *AT&T* litigation involved what the D.C. Circuit characterized as "a portentous clash between the [E]xecutive and [L]egislative [B]ranches," *AT&T I*, 551 F.2d at 385. In the pending appeal, as we have noted, the Lead Plaintiff is suing only in his individual capacity, not as President, and no official documents are sought. The only Executive Branch interest implicated is the possible distraction of the President in the performance of his duties, which we consider at pages 90–91. Furthermore, *AT&T I* concerned national security wiretaps, Executive Branch official documents of obvious sensitivity. Finally, the D.C. Circuit's advice in *AT&T I* was offered after the parties had already "negotiated extensively and came close to agreement." *Id*. at 394. The Court simply urged the parties to continue the process they had successfully begun and "requested" the parties "to attempt to

70

negotiate a settlement," *id*. at 395, because the "precise details of the [earlier] negotiations . . . demonstrate[d] the proximity of the parties to a workable compromise," *id*. at 386. The *Bean* litigation concerned a subpoena challenged as violative of the First Amendment. *See* 291 F. Supp. 3d at 37.

To the extent that the request for judicial assistance in narrowing the scope of the subpoenas is analogous to the role of district court judges managing pretrial discovery, they have broad discretion to determine the extent to which they should intervene, *see*, *e.g.*, *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003), and Judge Ramos did not exceed such discretion in this case by leaving any negotiation in the hands of experienced counsel prior to his ruling. In favoring a total remand, Judge Livingston does not consider our limited standard of review of the District Court's decision not to require the parties to negotiate, nor does she suggest that the District Court's discretion was exceeded. Moreover, Appellants have not identified a single category of documents sought or even a single document within a category that they might be willing to have the Banks produce if a negotiation had been required. Finally, we note the likely futility of ordering a total remand for negotiation, as Judge Livingston prefers,[65] in view of the fact that the White

---

[65] Judge Livingston reports that at oral argument the Committees "affirmed a willingness to negotiate on an expedited basis, if requested by this Court." Part. Diss. Op. at 11. The colloquy

House has prohibited members of the Administration from even appearing in response to congressional subpoenas and has informed Congress that "President Trump and his Administration cannot participate" in congressional inquiries.[66]

Judge Livingston suggests that a total remand would be useful to afford the parties an opportunity for further development of the record. However, Appellants have given no indication of what additional materials they would seek to add to the record, and the existing record fully suffices for disposition of this appeal.

---

to which Judge Livingston refers arose in response to a hypothetical inquiry from the Court as to whether certain sensitive documents such as a check for medical services should be excluded from disclosure. Counsel for the Committees responded that as to any documents "that have nothing to do with Mr. Trump and his family and these other businesses, his various businesses, have nothing to do with their real financial activities, we will direct Deutsche Bank not to produce those." Oral Arg. Tr. at p. 41, ll. 11–15. When the Court inquired further about the Committees' position if the Court were to insist on exclusion of such documents, counsel for the Committees responded, "[I]f this Court orders 'these subpoenas are enforceable but' — and drew this exception, consistent with the hypothetical your Honor has raised, we would have no problem with that." *Id*. at p. 41, ll. 22–25. Obviously, the Committees' willingness to comply with an order from this Court concerning exclusion of sensitive documents like a check for payment of medical expenses does not affirm the Committees' willingness to engage in negotiation. Later, the Committees said that "[i]f this court thinks there should be negotiation, . . . make it really, really fast," *id* at p. 46, ll. 8–10, and added, "Mr. Trump and the various other people have given no indication whatsoever that they actually would be willing to negotiate over — in any way that is serious." *Id*. at p. 46, ll. 17–19. Again, there is no expression of a willingness to negotiate.

In any event, the limited remand we order provides an opportunity for exemption from disclosure of more documents than even those we have labeled "sensitive."

[66] *See* Letter from Pat A. Cippolone, Counsel to the President, the Speaker of the House of Representatives, and three House committee chairmen (Oct. 8, 2019), https://www.nytimes.com/interactive/2019/10/08/us/politics/white-house-letter-impeachment. html. One recipient of this letter, Congressman Adam Schiff, is the chairman of one of the committees that issued subpoenas in this litigation.

A total remand would simply further delay production of documents in response to subpoenas that were issued seven months ago and would run directly counter to the Supreme Court's instruction that motions to enjoin a congressional subpoena should "be given the most expeditious treatment by district courts because one branch of Government is being asked to halt the functions of a coordinate branch." *Eastland*, 421 U.S. at 511 n.17.

*General substantive objections to scope of subpoenas.* One broad substantive challenge to the scope of the subpoenas is that they focus on the Lead Plaintiff.[67] This point is made in support of the broader argument that the subpoenas were issued with the expectation that some of the documents sought would embarrass

---

[67] In the District Court, the Committees stated, "Because of his prominence, much is already known about Mr. Trump, his family, and his business, and this public record establishes that they serve as a useful case study for the broader problems being examined by the Committee." Opposition of Intervenors to Plaintiffs' Motion for a Preliminary Injunction at 16, Dist. Ct. Dkt. No. 51 (May 10, 2019). Appellants repeatedly point to the phrase "case study" to argue that the Committees are not only focusing on the Lead Plaintiff but also doing so for law enforcement purposes. Br. for Appellants at 5, 11, 15, 31, 33, 50. However, as long as valid legislative purposes are duly authorized and being pursued by use of the challenged subpoenas, the fact that relevant information obtained also serves as a useful "case study" does not detract from the lawfulness of the subpoenas. Furthermore, congressional examination of whether regulatory agencies are properly monitoring a bank's practices does not convert an inquiry into impermissible law enforcement, and neither committee has made any allegation that the Lead Plaintiff or any of the Appellants has violated the law.

Moreover, when a borrower can obtain loans from only one bank, that bank has already lent the borrower $130 million, and that bank has been fined in connection with a $10 billion money laundering scheme, that situation is appropriate for a case study of such circumstances by a congressional committee authorized to monitor how well banking regulators are discharging their responsibilities and whether new legislation is needed.

the President, rather than advance a legitimate legislative purpose. One answer to the complaint about targeting the Lead Plaintiff and his family is that the Committees have represented that the three subpoenas at issue in this litigation are among a group of subpoenas "to seven other financial institutions, the majority of which do not request documents specific to" the Lead Plaintiff. Br. for Committees at 9.[68] In fact, the Deutsche Bank Subpoenas themselves seek documents from entities not related to Appellants. *See* Deutsche Bank Subpoenas ¶¶ 2–6, J. App'x 40–42. Another answer to the targeting objection is the significant relationship between Deutsche Bank and the Lead Plaintiff. The Committees have relied on information (not disputed by Appellants) indicating that when no other bank would extend credit to the Lead Plaintiff, Deutsche Bank loaned him or his affiliated entities at least $130 million dollars. That unusual circumstance adequately supports requests for information to determine whether proper banking procedures have been followed.

---

[68] Replying to this assertion by the Committees, the amicus brief of the United States says, "The bare fact that a 'majority' of *other* subpoenas may not be confined to the President's information hardly suggests that the *present* subpoenas are part of a general inquiry into reforms of the financial system, in which the President and his family have been caught up merely by chance . . . ." Br. for Amicus United States at 21 (emphases in original). The Committees make no claim that the subpoenas seek financial records of the Lead Plaintiff, his family, and his business entities "by chance." As we have recounted, the Committees have explicitly set out the circumstances that make the financial records of the Lead Plaintiff and affiliated persons and business entities appropriate subjects for legislative inquiry.

To whatever extent the targeting objection is really a claim that part of the motive of some members of the Committees for issuing the three subpoenas was to embarrass the Lead Plaintiff, the Supreme Court has made it clear that in determining the lawfulness of a congressional inquiry, courts "do not look to the motives alleged to have prompted it." *Eastland*, 421 U.S. at 508. The Court had earlier said, "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132 (citations omitted).

In this respect, the guiding principle is the same as that applicable when an arrest supported by probable cause is ruled valid despite the arresting officer's motive to retaliate against a suspect for exercising a First Amendment right. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019); *see also Hartman v. Moore*, 547 U.S. 250, 265–66 (2006) (absence of probable cause required for valid claim of initiating prosecution to retaliate against a defendant for exercising a First Amendment right).

But Appellants disclaim any objection based on inquiry into motive. "No aspect of this inquiry involves a search for Congress's hidden 'motives.'" Br. for Appellants at 26. Their point is that various statements of some members of

Congress reveal that the *purpose* of the investigations is to embarrass the President, not merely that such embarrassment was the *motive* for the investigations. In this context (as in some others[69]), the distinction between motive, *i.e.*, the reason for acting, and purpose, *i.e.*, the result sought, becomes somewhat blurred. We do not doubt that some members of the Committees, even as they pursued investigations for valid legislative purposes, hoped that the results of their inquiries would embarrass the President.[70] But as long as the valid legislative purposes that the Committees have identified are being pursued and are not artificial pretexts for ill-motivated maneuvers, the Committees have not exceeded their constitutional authority. The Supreme Court has stated that there is a "presumption" that the stated legislative purposes are the "real object" of the Committees' investigation. *McGrain*, 273 U.S. at 178. We need not rely on that presumption where we have

---

[69] *See*, *e.g.*, *Mobile v. Bolden*, 446 U.S. 55, 62 (1980) ("Our decisions, moreover, have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose."); *see generally* Andrew Verstein, *The Jurisprudence of Mixed Motives*, 127 Yale L.J. 1106 (2018).

[70] The Complaint in this case alleges the following remarks of some members of Congress. Rep. Waters, Chair of the Financial Services Committee, said, "I have the gavel—and subpoena power—and I am not afraid to use it." Complaint ¶ 37. Another member of Congress "stated that the new House majority would be 'brutal' for President Trump" and that "[w]e're going to have to build an air traffic control tower to keep track of all the subpoenas flying from here to the White House." *Id*. Others "were busy preparing a 'subpoena cannon' to fire at President Trump." *Id*. Others, "according to news outlets that interviewed party leaders," issued statements that "meant that they were going to spend the next two years launching a 'fusillade' of subpoenas in order to 'drown Trump with investigations,' 'turn Trump's life upside down,' and 'make Trump's life a living hell.'" *Id*. ¶ 36.

evidence that valid legislative purposes are being pursued and "the purpose[s] asserted [are] supported by references to specific problems which in the past have been or which in the future could be the subjects of appropriate legislation." *Shelton*, 404 F.2d at 1297.

Appellants object to the extensive time frame covered by the subpoenas, especially the absence of any time limitations on requests relating to account applications and the identity of those holding interests in accounts. Appellants also object to disclosure of financial records in the names of family members, including the Lead Plaintiff's grandchildren. However, such information, including documents dating back to when accounts were opened, is reasonably related to an investigation about money laundering.

Appellants contend that the subpoenas exceed any valid legislative purpose because, in their view, the subpoenas are intended to discover evidence of crimes, thereby indicating that the Committees are pursuing a law enforcement objective, which is beyond the power of Congress. *See Quinn*, 349 U.S. at 161. But, as Appellants themselves recognize, "a permissible legislative investigation does not become impermissible because it might reveal evidence of a crime." Br. for Appellants at 22. Any investigation into the effectiveness of the relevant agencies'

existing efforts to combat money laundering or the need for new legislation to render such efforts more effective can be expected to discover evidence of crimes, and such discovery would not detract from the legitimacy of the legislative purpose in undertaking the investigation. The Supreme Court long ago rejected Appellants' argument: "Nor do we think it a valid objection to the investigation that it might possibly disclose crime or wrongdoing on [an executive branch official's] part." *McGrain*, 273 U.S. at 179–80. *See Sinclair*, 279 U.S. at 295 ("[T]he authority of [Congress], directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in [criminal prosecutions].").

Appellants fault Judge Ramos, who, they contend, "asserted that Congress has an independent 'informing function' that allows it to . . . 'publicize corruption . . . in agencies of the Government,' even absent a connection to 'contemplated legislation in the form of a bill or statute.'" Br. for Appellants at 23 (quoting District Court opinion, J. App'x 127). Although the phrases quoted from the Court's opinion are accurate, the brief's addition of the words "independent" and "absent a connection" is a mischaracterization of what Judge Ramos said. He was not asserting an independent informing function or investigative power *absent* a

78

connection to a legislative purpose. He was careful to state that Congress's legislative authority "*includes* a more general informing function." J. App'x 127 (emphasis added). This reflected the Supreme Court's statement in *Hutchinson v. Proxmire*, 443 U.S. 111, 132–33 (1979), that "congressional efforts to inform itself through committee hearings are part of the legislative function."[71]

However, some of the Court's statements in *Watkins* create uncertainty as to whether, and in what circumstances, an informing function permits public disclosure of information obtained as part of a valid legislative inquiry. On the one hand, the Court said, "We have no doubt that there is no congressional power to expose for the sake of exposure." 354 U.S. at 200. On the other hand, the Court also said, "The public is, of course, entitled to be informed concerning the workings of its government."[72] *Id*. And, in cautioning that the public's right to be informed about its government "cannot be inflated into a general power to expose," *id*., the Court added in the same sentence, "where the *predominant result* can *only* be an

---

[71] To whatever extent Judge Ramos might be understood as treating the informing function as an additional source of Congress's power, he did not rely on that source of authority, mentioning it only as part of a general overview of Congress's powers.

[72] In *Hutchinson*, the Supreme Court arguably contradicted this statement when it said, "[T]he transmittal of . . . information by individual Members in order to inform the public [about their activities in Congress] is not a part of the legislative function or the deliberations that make up the legislative process." 443 U.S. at 133. However, the Court's next sentence makes the limited context clear: "As a result, transmittal of such information by press releases and newsletters is not protected by the Speech or Debate Clause." *Id*.

invasion of the private rights of individuals," *id.* (emphases added). The Court also noted that it was "not concerned with the power of the Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Id*. at 200 n.33. These latter statements make clear that Congress can obtain information in an investigation as long as the information is collected in furtherance of valid legislative purposes. In the pending appeal, the high significance of the valid legislative purposes demonstrates that the "predominant purpose" of the Committees' inquiries cannot be said to be "only" to invade private rights.

*Specific substantive objections to scope of subpoenas.* We next consider Appellants' specific challenges to the scope of the subpoenas. Of the three subpoenas, the two identical subpoenas to Deutsche Bank have the broadest scope. These subpoenas fill six single-spaced pages describing eight categories of documents, subdivided into 52 paragraphs, many of which request several types of items. If such extensive document requests were made during discovery in ordinary civil litigation, an initial response would likely be that the requests are too burdensome. In this case, however, the Banks have made no claim that compiling the requested documents imposes an excessive burden on them. It is

Appellants whose privacy is claimed to be unlawfully impaired by the Banks' compliance with the subpoenas who challenge the breadth of the requests. To consider that challenge we examine the subpoenas in detail.

We note that of the eight categories of documents sought by the two Deutsche Bank Subpoenas, only categories 1, 7, and 8 request documents belonging to, or likely to reveal information concerning, Appellants or entities they control or in which they are alleged to have interests. The Committees confirmed this fact during oral argument, without dispute from Appellants. The first category of documents includes, with respect to the individuals (including members of their immediate families) and entities named: documents reflecting applications to open accounts, due diligence, and related items, ¶ 1(i); account statements, ¶ 1(ii); transfers of amounts in excess of $10,000, ¶ 1(iii); summaries or analyses of account activity including the destination of checks (without limitation as to amount), ¶ 1(iv); suspicious activity, ¶ 1(v); investment, mortgage, and credit arrangements and related items, ¶ 1(vi), including appraisals of assets, ¶ 1(vi)(d), and financial information provided by borrowers, ¶ 1(vi)(e), such as tax returns, ¶ 1(vi)(e)(7), and bankruptcy records, ¶ 1(vi)(e)(8); information supplied pursuant to §§ 314(a) or 314(b) of the PATRIOT Act, Pub. L. No. 107-56, ¶ 1(vii); records

generated by named bank employees, ¶ 1(viii); documents not kept in customary record-keeping systems related to the named individuals and entities, ¶ 1(ix); and matters discussed with Deutsche Bank's boards, ¶ 1(x).

The seventh category covers documents reflecting periodic reviews of the identified individuals and entities. ¶ 7. The eighth category covers any communications by named employees of the Banks concerning the identified individuals and entities. ¶ 8. Many of the paragraphs in categories 1, 7, and 8 seek documents "including, but not limited to, those involving any foreign individual, entity, or government" or similar language. *E.g.*, ¶ 1(vi), ¶ 1(vi)(k).

The subpoena from the Financial Services Committee to Capital One is less extensive, filling one and one-half single-spaced pages describing one category of documents, subdivided into fifteen paragraphs, two of which request several items. This category includes, with respect to accounts held by the entities named and their principals, directors, etc.: documents related to applications to open accounts and due diligence, ¶ 1(i); documents identifying those with interests in the accounts, ¶ 1(ii); documents identifying any account manager, ¶ 1(iii); monthly statements and cancelled checks in excess of $5,000, ¶ 1(iv); summaries or analyses of account activity including the destination of checks (without limitation as to

amount), ¶ 1(v); transfers in excess of $10,000, ¶ 1(vi); documents concerning suspicious activity, ¶ 1(vii); reviews of accounts pursuant to Capital One's procedures related to Bank Secrecy Act, anti-money-laundering, and compliance with guidance on "Politically Exposed Persons," ¶ 1(viii); documents not kept in customary record-keeping systems related to any loan provided to the named entities, ¶ 1(ix); documents related to real estate transactions, ¶ 1(x); documents provided in response to any subpoena or request from any U.S. Federal or state agency, ¶ 1(xi)(a); notices of administrative, civil, or criminal actions, ¶ 1(xi)(b); requests pursuant to §§ 314(a) or 314(b) of the PATRIOT Act, ¶ 1(xi)(c); and requests for information to or from a third party, ¶ 1(xi)(d).

*Sensitive personal information.* A specific item in the subpoenas that raises serious concerns as to whether even valid legislative purposes permit exposure of matters entitled to privacy protection is the request for "analyses of . . . transfers, including . . . the destination of the transfers . . ., including *any . . . check . . . .*" Deutsche Bank Subpoenas, ¶ 1(iv); Capital One Subpoena, ¶ 1(v) (emphasis added). These items have no dollar limitations, even though other provisions limit transfer information to checks above specified amounts. Deutsche Bank Subpoenas, ¶ 1(iii) ($10,000); Capital One Subpoena, ¶ 1(iv) ($5,000). In addition

83

to "analyses" of all checks, the Deutsche Bank Subpoenas seek "monthly or other periodic account statements" including "outgoing funds transfers," ¶ 1(ii), which might reveal the recipients of at least some checks.

These provisions create a risk that some of the checks sought might reveal sensitive personal details having no relationship to the Committees' legislative purposes. For example, if one of the entities decided to pay for medical services rendered to an employee, the check, and any similar document disclosing sensitive personal information unrelated to business transactions, should not be disclosed. The same would be true of any check reflecting payment for anyone's medical services. The Committees have advanced no reason why the legislative purposes they are pursuing require disclosure of such sensitive personal information. Indeed, counsel for the Committees at oral argument appeared to recognize that such sensitive personal information need not be disclosed. Oral Arg. Tr. at p. 41, ll. 8–18. We have not located any decision that has considered whether Congress is entitled to require disclosure of sensitive personal information that might be swept up in a collection of business-related financial documents legitimately sought in aid of legislative purposes. At least in the absence of a compelling reason for such disclosure, we decline to permit it in this case.

*Other possibly excludable documents.* In addition to what we have described as "sensitive documents," we recognize that there might be a few documents within the coverage of the subpoenas that have such an attenuated relationship to the Committees' legislative purposes that they need not be disclosed.

We have concluded that the coverage of the following paragraphs of the Deutsche Bank Subpoenas might include some documents warranting exclusion: paragraphs 1(ii), 1(iv), 1(vi)(e), 1(viii), and 8. We reach the same conclusion as to the following paragraphs of the Capital One subpoena: paragraphs 1(iv), 1(v), 1(x), and 1(xi)(d). We have no such concerns with the coverage of any of the other paragraphs of the subpoenas. All the documents within the coverage of these other paragraphs are sufficiently likely to be relevant to legislative purposes.[73] Even if within the coverage of these other paragraphs are some documents that turn out not to advance the Committees' investigations, that would not be a valid reason for excluding such documents from production. As the Supreme Court has observed with reference to another challenge to a congressional subpoena seeking

---

[73] For example, paragraph 1(v) of the Deutsche Bank subpoenas calls for production of "any document related to monitoring for . . . possible suspicious activity," and paragraph 1(vii) calls for production of "any document related to any request for information issued or received by Deutsche Bank AG pursuant to Sections 314(a) or 314(b) of the USA PATRIOT Act," provisions that concern money laundering.

private banking records, "The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509.

Any attempt to identify for exclusion from disclosure documents within the listed paragraphs must be done with awareness that a principal legislative purpose of the Committees is to seek information about the adequacy of banking regulators' steps to prevent money laundering, a practice that typically disguises illegal transactions to appear lawful. Many documents facially appearing to reflect normal business dealings will therefore warrant disclosure for examination and analysis by skilled investigators assisting the Committees to determine the effectiveness of current regulation and the possible need for improved legislation.

*Procedure for exclusion of specific documents.* To facilitate exclusion of sensitive documents and those few documents that should be excluded from the coverage of the listed paragraphs, we instruct the District Court on remand to implement the following procedure:[74] (1) after each of the Banks has promptly, and in no event beyond 30 days, assembled all documents within the coverage of paragraphs 1(ii),

---

[74] *See* 28 U.S.C. § 2106 (appellate court "may remand the cause and . . . require such further proceedings to be had as may be just under the circumstances.").

1(iv), 1(vi)(e), 1(viii), and 8 of the Deutsche Bank Subpoenas and paragraphs 1(iv), 1(v), 1(x), and 1(xi)(d) of the Capital One Subpoena, counsel for Appellants shall have 14 days to identify to the District Court all sensitive documents and any documents (or portions of documents) within the coverage of the listed paragraphs that they contend should be withheld from disclosure, under the limited standard discussed above; (2) counsel for the Committees shall have seven days to object to the nondisclosure of such documents; (3) the District Court shall rule promptly on the Committees' objections; (4) Appellants and the Committees shall have seven days to seek review in this Court of the District Court's ruling with respect to disclosure or nondisclosure of documents pursuant to this procedure.[75] Any appeal of such a ruling will be referred to this panel.

The abbreviated timetable of this procedure is set in recognition of the Supreme Court's instruction that motions to enjoin a congressional subpoena should "be given the most expeditious treatment by district courts because one branch of Government is being asked to halt the functions of a coordinate branch." *Eastland*, 421 U.S. at 511 n.17.

---

[75] Review may be initiated by a letter to the Clerk of this Court, referencing the existing docket number, without the need to file a notice of appeal.

*All other documents.* All documents within the coverage of the paragraphs not listed and those documents not excluded pursuant to the procedure outlined above shall be promptly transmitted to the Committees in daily batches as they are assembled, beginning seven days from the date of this opinion.

Except as provided above, all three subpoenas seek documents that the Committees are entitled to believe will disclose information pertinent to legitimate topics within the Committees' authorized investigative authority, especially money laundering, inappropriate foreign financial relationships with the named individuals and entities, and Russian operations to influence the U.S. political process. As the Supreme Court has observed, documents subpoenaed by a congressional committee need only be "not plainly incompetent or irrelevant to any lawful purpose [of a committee] in the discharge of its duties." *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (quotation marks and brackets omitted). The documents sought by the three subpoenas easily pass that test. The subpoenas are reasonably framed to aid the Committees in fulfilling their responsibilities to conduct oversight as to the effectiveness of agencies administering statutes within the Committees' jurisdiction and to obtain information appropriate for consideration of the need for new legislation.

*Objections of the United States as amicus curiae.* The United States makes several additional arguments in its amicus curiae brief. The amicus brief contends that "the possibility that a subpoena might transgress separation-of-powers limits . . . mandates that the House clearly authorize a subpoena directed at [the President's] records." Br. for Amicus United States at 10 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), and *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991)). First, this case does not concern separation of powers. The Lead Plaintiff is not suing in his official capacity, no action is sought against him in his official capacity, no official documents of the Executive Branch are at issue, Congress has not arrogated to itself any authority of the Executive Branch, and Congress has not sought to limit any authority of the Executive Branch.

Second, the cited cases, *Franklin* and *Armstrong*, do not concern congressional requests for information. Both require a clear statement from Congress when a statute is claimed to limit presidential power. In all of the numerous decisions concerning congressional subpoenas for information from Executive Branch officials, including the President, there is not even a hint, much less a ruling, that the House (or Senate) is required to authorize a specific subpoena issued by one of its committees. In any event, the materials cited above provide

sufficient clarity, in light of Supreme Court decisions concerning congressional investigations, to authorize subpoenas for the Lead Plaintiff's unofficial business records in aid of valid legislative purposes.

The amicus brief argues that a President is "entitled to special solicitude in discovery," Br. for Amicus United States at 6 (citing *Cheney*, 542 U.S. at 385, and *In re Trump*, 928 F.3d 360, 371–72 (4th Cir. 2019)), "even in suits solely related to his private conduct," *id*. (citing *Jones*, 520 U.S. at 707). As a general proposition, we agree and have endeavored to recognize that point in the special procedure we have directed the District Court to follow on a limited remand. We note, however, that in *Cheney* the Supreme Court was careful to point out that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385. In the pending appeal, the Lead Plaintiff is suing in his individual capacity, no confidentiality of any official documents is asserted, and any concern arising from the risk of distraction in the performance of the Lead Plaintiff's official duties is minimal in light of the Supreme Court's decision in *Clinton v. Jones*, and, in any event, far less substantial than the importance of achieving the legislative purposes identified by Congress. In *Jones*,

the claimed distraction was that attending a deposition and being subjected to a civil trial would divert some of the President's time from performance of his official duties; in the pending case, there is no claim of any diversion of any time from official duties. *Jones*, although expressing concern with "the high respect that is owed to the office of the Chief Executive," not only permitted discovery directed to the President but also obliged him to be subjected to a civil trial. 520 U.S. at 707.[76]

*In re Trump*, 928 F.3d at 379–80, concerned a petition for mandamus directing a District Court to dismiss for lack of standing a complaint alleging violation of the Foreign and Domestic Emoluments Clauses, U.S. Const. art I, § 9, cl. 8, art II, § 1, cl. 7.

---

[76] Judge Livingston seeks to minimize the significance of *Clinton v. Jones* on several grounds. First, she attempts to refute our point that this case does not involve separation-of-powers concerns, Part. Diss. Op. at 15–16, but in doing so, she accords little significance to the major reason for that point: the Lead Plaintiff is suing in his individual, not his official, capacity. She then seeks to relegate *Jones* to near insignificance by referring to "longstanding interbranch practice," *id*. at 17, again ignoring the fact that this litigation is not a conflict between branches of the Government. The fact that the United States filed only an amicus curiae brief, rather than intervene to assert the interests of the United States or those of the office of the President, underscores the absence of a true interbranch conflict. The point that compliance with the subpoenas will not have an impact on the Lead Plaintiff's time sufficient to bar compliance arises from a comparison with *Clinton v. Jones*, in which the Supreme Court required a President to be available for a deposition and be subject to a civil trial. The so-called distraction of the Lead Plaintiff is of far less significance than what the Supreme Court permitted with respect to President Clinton. In sum, Judge Livingston offers no reason to think that compliance with the subpoenas will distract the Lead Plaintiff from the performance of official duties to a greater extent than the Supreme Court permitted in *Clinton v. Jones*.

The amicus brief not only repeats Appellants' argument that the House must identify a legitimate legislative purpose for seeking the President's information, but adds that it must do so "with sufficient particularity that courts can concretely review the validity of any potential legislation and determine whether the information requested is pertinent and necessary to Congress's consideration of such legislation." Br. for Amicus United States at 11. The meaning of this sentence is not clear. If it means that legislative purpose must be sufficiently identified to enable a court now to consider the validity of any legislation that might be enacted in the future, it would encounter the prohibition on advisory opinions. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III."). On the other hand, if the sentence means that legislative purpose must be sufficiently identified so that it will serve as an aid in interpreting legislation that might be enacted in the future, there is no requirement that legislative purpose sufficient to support a congressional subpoena must also suffice to aid a court in interpreting some statute yet to be enacted. In any event, the legislative purposes of the Committees' subpoenas have been sufficiently identified.

Refining Appellants' argument that the Committees' valid legislative purposes have not been adequately identified, the amicus brief argues that "courts must assess 'the connective reasoning whereby the precise questions asked relate to' the legitimate legislative purpose." Br. for Amicus United States at 14 (quoting *Watkins*, 354 U.S. at 215). This quotation from *Watkins* is difficult to square with the Supreme Court's later statement in *McPhaul* that subpoenaed documents need only be "not plainly incompetent or irrelevant to any lawful purpose [of a committee] in the discharge of its duties." *McPhaul*, 364 U.S. at 381 (quotation marks and brackets omitted). It would appear that the "connective reasoning" phrase of *Watkins*, if still valid at all, is limited to the context in which it was said–a committee witness's objection to a specific question–and not to a subpoena for adequately described categories of documents that are relevant to adequately identified valid legislative purposes of investigation.

The amicus brief argues that subpoenaed information "not 'demonstrably critical' should be deemed insufficiently pertinent when directed at the President's records." Br. for Amicus United States at 15 (quoting *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (in banc)). The D.C. Circuit used the phrase "demonstrably critical" as a standard for

93

overcoming a claim of executive privilege. *See Nixon*, 498 F.2d at 727. President

Nixon had asserted that tape recordings of his conversations with senior staff

"cannot be made public consistent with the confidentiality essential to the

functioning of the Office of the President." *Id*. (internal quotation marks omitted).

In the pending appeal, no claim of executive privilege has been made, much less a

claim that withholding the subpoenaed documents is "essential to the functioning

of the Office of the President." *Id*.

The amicus brief asserts that "[c]ourts may require the Committees first 'to

narrow the scope of the subpoenas' to first seek critical information in light of the

President's constitutional interests," Br. for Amicus United States at 17 (ellipsis

omitted) (quoting *Cheney*, 542 U.S. at 390), and that "[c]ourts may require Congress

first to determine whether records relevant to a legitimate legislative purpose are

not, in fact, available from other sources that would not impinge on constitutional

interests," *id*. (citing *Watkins*, 354 U.S. at 206). That argument has no application to

the many documents that were generated by the Banks. Moreover, the District

Court was not required to do what it "may" do,[77] and the President's

---

[77] The amicus brief asserts that the District Court "assumed that it had no authority to deal with the overbroad character of the congressional subpoenas here." Br. for Amicus United States at 25 (citing J. App'x 138). We see no indication that the District Court made such an assumption, either at the cited reference to the District Court's opinion or elsewhere in that opinion.

"constitutional interests" are implicated when *official* documents are sought, as in *Cheney*, precipitating "a conflict between the [L]egislative and [E]xecutive [B]ranches," *AT&T I*, 551 F.2d at 390.

The amicus brief contends that H.R. 507 is insufficient authorization for the subpoenas to the extent that it authorizes not only current subpoenas to the named persons and entities but also future subpoenas to them. Br. for Amicus United States at 18. Because the pending appeal concerns denial of a preliminary injunction to prevent compliance with issued subpoenas, we make no determination with respect to future subpoenas.

In an overarching argument endeavoring to strengthen and make decisive many of the arguments just considered, the amicus brief urges the principle of constitutional avoidance. Confronting a constitutional challenge to a statute of uncertain meaning, courts sometimes interpret the statute so that it clearly comports with the Constitution. *See, e.g., Crowell v. Benson*, 285 U.S. 22, 62 (1932). Enlisting the principle of constitutional avoidance in the pending appeal, the amicus brief contends that the principle should persuade this Court to require the Committees to "'explore other avenues'" for obtaining the information, Br. for Amicus United States at 3 (quoting *Cheney*, 542 U.S. at 390); to require the District

Court "to proceed in a more tailored manner," *id*. at 5; to approach "with the utmost caution" the task of "balanc[ing] Congress's interest in the information against any constitutional interests of the party withholding it," *id*. at 16; and to require the District Court "to attempt to avoid a conflict between constitutional interests before it can 'intervene responsibly,'" *id*. at 17–18 (quoting *AT&T II*, 567 F.2d at 131). The amicus brief also reminds us of the Supreme Court's statement in *Rumely* suggesting "abstention from adjudication unless no choice is left." 345 U.S. at 46.

In the circumstances of this case, we do not believe that constitutional avoidance adds persuasive force to the arguments in the amicus brief. First, we question whether constitutional avoidance applies beyond the context of interpreting ambiguous statutes that are challenged as unconstitutional. The Supreme Court considered that question in an analogous situation in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). Broadcasters urged the Court to apply to the FCC a more stringent arbitrary-and-capricious standard of review of agency actions that implicate constitutional liberties. *See id*. at 516. In declining to do so, the Court said, "We know of no precedent for applying [the principle of constitutional avoidance] to limit the scope of authorized executive action." *Id*. ~~at~~

516. Similarly, it is at least doubtful whether the principle should be enlisted to limit the scope of authorized congressional action.

Second, to the extent that decisions like *Cheney* and *Rumely* advised courts to proceed with caution, they did so in contexts quite different from the pending appeal. *Cheney* involved a real confrontation between the Legislative and Executive Branches; *Rumely* involved a "limitation imposed by the First Amendment," 345 U.S. at 44. By contrast, the pending appeal involves solely private financial documents, and the Lead Plaintiff sues only in his individual capacity. The only defense even implicating the office of the presidency is the possibility that document disclosure might distract the Lead Plaintiff in the performance of his official duties, a risk we have concluded, in light of Supreme Court precedent, *Clinton v. Jones,* is minimal at best. Appellants make no claim that Congress or its committees are purporting to curb in any way the powers of the Executive Branch.

For all of these reasons, we see no reason to permit constitutional avoidance to provide added strength to the arguments of the amicus or Appellants themselves.

Having considered Appellants' statutory and constitutional claims, we conclude that they have not shown a likelihood of success on any of them. In reaching this conclusion, we recognize that we are essentially ruling on the ultimate merits of Appellants' claims. But, as the Supreme Court has pointed out, "Adjudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail." *MuFnaf v. Geren*, 553 U.S. 674, 691 (2008). That is the situation here.

III. Sufficiently Serious Questions to Make Them a Fair Ground for Litigation

In considering the less rigorous serious-questions standard for a preliminary injunction, it is important to recognize that the first component of this standard, in addition to a balance of hardships tipping decidedly in favor of the moving party, is "sufficiently serious questions going to the merits *to make them a fair ground for litigation*." *Kelly*, 933 F.3d at 184 (emphasis added); *Jackson Dairy*, 596 F.2d at 72. The meaning of this emphasized phrase rarely receives explicit consideration. Two interpretations are possible.

The phrase could mean that the questions raised have sufficiently serious *legal* merit to be open to reasonable debate. That view of the phrase would be especially appropriate in those cases where the need for preliminary relief

precipitously arose just prior to some impending event and the party seeking temporary relief has not had an adequate opportunity to fully develop its legal arguments. Alternatively, or in addition, the phrase could mean that the questions raised have sufficiently serious *factual* merit to warrant further investigation in discovery and, if summary judgment is not warranted, at trial.

In the pending appeal, the District Court stated, "The word 'serious' relates to a question that is both serious and open to reasonable debate." J. App'x 150. But Judge Ramos declined to accept Appellants' claim that just raising a constitutional objection to the subpoenas sufficed to render the claim serious. As he observed, if that sufficed, "every complaint challenging the power of one of the three coordinate branches of government would result in preliminary relief, regardless of whether established law renders the complaint unmeritorious." *Id*.

Our case law indicates that the phrase "make them fair ground for litigation" often refers to those *factual* disputes that can be resolved at trial only after investigation of the facts. We have stated that the questions raised by a plaintiff's claims must be "so serious, substantial, difficult and doubtful as to make them a fair ground for litigation *and thus for more deliberate investigation*." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (emphasis added).

99

The emphasized words appear to have originated in *Hamilton Watch*, but have been frequently repeated by this Court. *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 692, 93 (2d Cir. 1973); *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir. 1969); *Unicon Management Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2d Cir. 1966). More recently, we pointed out in *Citigroup Global Markets* that a virtue of the serious-questions standard is "that it permits the entry of an injunction in cases where *a factual dispute* renders a fully reliable assessment of the merits impossible." 598 F.3d at 36 (emphasis added). For example, in *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977), we affirmed a preliminary injunction under the serious-questions standard because the plaintiff had presented affidavits, depositions, and exhibits sufficient to contest the factual issue of the reason for an employee's termination, *see id*. at 444.

We need not choose between these meanings of "fair ground for litigation." Appellants are not entitled to a preliminary injunction under the serious-questions standard because (1) that standard, as we have discussed, *see* Part I, does not apply to preliminary injunctive relief sought to prevent governmental action, and (2) even if applicable, the standard requires a balance of hardships that tips decidedly to the plaintiff, a requirement not met in this case, *see* Point IV. We also point out

that, to the extent that the serious-questions standard furnishes an opportunity to develop legal arguments concerning a reasonably debatable question, Appellants have fully developed their positions in the 95 pages of briefs they have submitted. To the extent that the serious-questions standard is available for factual development of an issue, Appellants have not identified a single factual issue that might warrant a trial or a single witness or document that might add substance to their claims at a trial.

Furthermore, both their statutory and constitutional claims, though serious in at least some sense, lack merit, and, because they both involve solely issues of law, are properly rejected at this stage of the litigation, *see Munaf*, 553 U.S. at 691–92, except for the limited remand we have ordered.

IV. Balance of Hardships/Equities

The hardship for Appellants if a preliminary injunction is denied would result from the loss of privacy for their financial documents. We have recognized that this loss of privacy is irreparable. In assessing the seriousness of that loss for purposes of determining the balance of hardships, we note that the loss will be somewhat mitigated to the extent that sensitive personal information and some documents will not be disclosed pursuant to the procedure we have ordered upon

remand. The seriousness of the hardship arising from disclosure of the information called for by the subpoenas should be assessed in light of the fact that the Lead Plaintiff is already required to expose for public scrutiny a considerable amount of personal financial information pursuant to the financial disclosure requirement of the Ethics in Government Act, 5 U.S.C. app. §§ 101–111, although considerably more financial information is required to be disclosed by the subpoenas.

The hardship for the Committees if a preliminary injunction is granted would result from the loss of time to consider and act upon the material disclosed pursuant to their subpoenas, which will expire at the end of the 116th Congress. This loss is also irreparable. In assessing the seriousness of that loss for purposes of determining the balance of hardships, we note that the Committees have already been delayed in the receipt of the subpoenaed material since April 11 when the subpoenas were issued. They need the remaining time to analyze the material, hold hearings, and draft bills for possible enactment.

Even if the balance of these hardships/equities tips in favor of Appellants, which is debatable, it does not do so "decidedly," *Kelly*, 933 F.3d at 184; *Jackson Dairy*, 956 F.2d at 72, as our serious-questions standard requires.

102

V. Public Interest

The public interest in vindicating the Committees' constitutional authority is clear and substantial. It is the interest of two congressional committees, functioning under the authority of a resolution of the House of Representatives authorizing the subpoenas at issue, to obtain information on enforcement of anti-money-laundering/counter-financing of terrorism laws, terrorist financing, the movement of illicit funds through the global financial system including the real estate market, the scope of the Russian government's operations to influence the U.S. political process, and whether the Lead Plaintiff was vulnerable to foreign exploitation. The opposing interests of Appellants, suing only in their private capacity, are primarily their private interests in nondisclosure of financial documents concerning their businesses, rather than intimate details of someone's personal life or information the disclosure of which might, as in *Watkins*, 354 U.S. at 197–99, chill someone's freedom of expression.

We recognize, however, that the privacy interests supporting nondisclosure of documents reflecting financial transactions of the Lead Plaintiff should be accorded more significance than those of an ordinary citizen because the Lead Plaintiff is the President. Although the documents are not official records of the

Executive Branch, the Lead Plaintiff is not suing in his official capacity, and no executive privilege has been asserted, disclosure of the subpoenaed documents can be expected to risk at least some distraction of the Nation's Chief Executive in the performance of his official duties. *See Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982) (noting risk of distraction as one reason for establishing immunity of President from civil liability for official actions). That concern, we note, did not dissuade the Supreme Court from requiring President Nixon to comply with a district court's subpoena to produce tape recordings of conversations with senior staff, *see United States v. Nixon*, 418 U.S. 683 (1974), or requiring President Clinton to submit to discovery, including a deposition, in civil litigation involving pre-presidential conduct, *see Jones*, 520 U.S. at 697–706.[78] *See also Trump v. Vance*, 941 F.3d 631, 641 n. 12 (2d Cir. 2019) (concluding that "the disclosure of personal financial information, standing alone, is unlikely to impair the President in

---

[78] In *Jones*, the Supreme Court stated, "The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution." 520 U.S. at 703. The same can be said as to Congress's exercise of its traditional Article I jurisdiction. One court has discounted concern that compliance with document requests might distract the President in the performance of official duties by noting that "the President himself appears to have had little reluctance to pursue personal litigation despite the supposed distractions it imposes upon his office." *District of Columbia v. Trump*, 344 F. Supp. 3d 828, 843 (D. Md. 2018) (collecting examples), *rev'd on other grounds (lack of standing)*, *In re Trump*, 928 F.3d 360 (4th Cir. 2019).

performing the duties of his office"), *petition for cert. filed*, No. 19-635 (U.S. Nov. 14, 2019).

The Committees' interests in pursuing their constitutional legislative function is a far more significant public interest than whatever public interest inheres in avoiding the risk of a Chief Executive's distraction arising from disclosure of documents reflecting his private financial transactions.

Conclusion

For all of these reasons, we conclude that under the applicable likelihood-of-success standard, Appellants' motion for a preliminary injunction was properly denied, except as to disclosure of any documents that might be determined to be appropriate for withholding from disclosure pursuant to our limited remand. The serious-questions standard is inapplicable, the balance of hardships does not tip decidedly in favor of Appellants, and the public interest favors denial of a preliminary injunction.

We affirm the District Court's order in substantial part to the extent that it denied a preliminary injunction and order prompt compliance with the subpoenas, except that the case is remanded to a limited extent for implementation of the procedure set forth in this opinion concerning the nondisclosure of sensitive

personal information and a limited opportunity for Appellants to object to disclosure of other specific documents within the coverage of those paragraphs of the subpoenas listed in this opinion. The mandate shall issue forthwith, but compliance with the three subpoenas and the procedure to be implemented on remand is stayed for seven days to afford Appellants an opportunity to apply to the Supreme Court or a Justice thereof for an extension of the stay.

DEBRA ANN LIVINGSTON, *Circuit Judge*, concurring in part and dissenting in part:

Although not expressly provided for in the Constitution, Congress's power to conduct investigations for the purpose of legislating is substantial, "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) (quoting *Barenblatt v. United States*, 360 U.S. 109, 111 (1959)). Yet this power is not unlimited. When Congress conducts investigations in aid of legislation, its authority derives from its *responsibility to legislate*—to consider the enactment of new laws or the improvement of existing ones for the public good.[1] Congress has no power to expose personal information for the sake of exposure, *see Watkins v. United States*, 354 U.S. 178, 200 (1957) (expressing "*no doubt* that there is no congressional power to expose for the sake of exposure" (emphasis added)), nor

---

[1] None of these subpoenas issued in connection with an impeachment proceeding, in which Congress's investigatory powers are at their peak, but rather, as stated, "in aid of legislation." *See Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880) (noting that "[w]here the question of . . . impeachment is before [the House or the Senate] acting in its appropriate sphere on that subject, we see no reason to doubt the right to compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases"); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (citing to Article I, Section 2 of the Constitution when noting that impeachment investigations in the House have "an express constitutional source" which differentiates them from Congress's general oversight or legislative power).

1

may it seek information to enforce laws or punish for their infraction—responsibilities which belong to the executive and judicial branches respectively, and not to it. *Id.* at 187 (noting that Congress is neither "a law enforcement [n]or trial agency," as "[t]hese are functions of the executive and judicial departments of government"). As the Supreme Court has put it: "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.*

The legislative subpoenas here are deeply troubling. Targeted at the President of the United States but issued to third parties, they seek voluminous financial information not only about the President personally, but his wife, his children, his grandchildren, his business organizations, and his business associates.[2] Collectively, the subpoenas seek personal and business banking records stretching back nearly a decade (and with regard to several categories of

---

[2] The Plaintiff entities here are defined to include not only parents, subsidiaries, related joint ventures and the like, but any "current or former employee, officer, director, shareholder, partner, member, consultant, senior manager, manager, senior associate, staff employee, independent contractor, agent, attorney or other representative of any of those entities," so that the banking records of numerous individuals beyond the President's immediate family are potentially included in this dragnet. J.A. at 47, 58.

2

information, *with no time limitation whatsoever*) and they make no distinction between business and personal affairs, nor consistently between large and small receipts and expenditures. To be sure, breadth may be necessary in legislative subpoenas so that Congress can learn about a proposed subject of legislation sufficiently to enact new laws or improve the old ones: such learning is "an indispensable ingredient of lawmaking."[3] *Eastland*, 421 U.S. at 505. Still, the district court was of the view that in a routine civil case, it would have sent the parties into a room with the instruction that "you don't come out until you come back with a reasonable subpoena." J.A. at 94. The majority doesn't disagree. It, too, characterizes the subpoenas as "surely broad in scope." Maj. Op. at 45. It acknowledges that compliance will "subject [the President's] private business affairs to the Committees' scrutiny," *id.* at 48, and impose irreparable harm, *id.* at 13. It could have added that *personal* banking records of the President and his family are not excluded, and that neither House committee seeking this

---

[3] That said, "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events," which appears to be the focus of the present subpoenas. *Nixon*, 498 F.2d at 732.

information will commit to treating any portion of it as confidential, irrespective of any public interest in disclosure. J.A. at 122–23.

The majority and I are in agreement on several points. First, we agree that the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401–3423, does not apply to Congress because, as the majority correctly concludes, Congress is not a "Government authority" within the meaning of that statute. Maj. Op. at 24–33. We likewise agree that 26 U.S.C. § 6103 of the Internal Revenue Code does not pose an obstacle to Deutsche Bank AG's disclosure of tax returns in its possession in response to the Committees' subpoenas. *Id.* at 34–44. Accordingly, I concur that, as to the statutory arguments presented by the Plaintiffs, they have raised no serious question suggesting that the House subpoenas may not be enforced.

The statutory arguments, however, are not the only arguments presented. The majority and I agree that this appeal raises an important issue regarding the investigative authority of two committees of the United States House of Representatives—the House Committee on Financial Services and the House Permanent Select Committee on Intelligence (collectively, "Committees")—in the context of their efforts to obtain voluminous personal and business banking records of the President of the United States, members of his immediate family,

4

his primary business organization and affiliated entities, and his business associates. Maj. Op. at 4. In fact, the question before us appears not only important (as the majority acknowledges) but of first impression: the parties are unaware of *any* Congress before this one in which a standing or permanent select committee of the House has issued a third-party subpoena for documents targeting a President's personal information solely on the rationale that this information is "in aid of legislation." Trump Br. at 14; Tr. of Oral Arg. at 34:24–35:3–4. But this House has now authorized *all* such House committees to issue legislative subpoenas of this sort, so long as directed at information involving this President, his immediate family, business entities, or organizations. H.R. Res. 507, 116th Cong. (2019); *see also* H.R. Res. 509, 116th Cong. § 3 (2019) ("House Resolution 507 is hereby adopted.").

In such a context, "experience admonishes us to tread warily." *United States v. Rumely*, 345 U.S. 41, 46 (1953). I agree with the majority that our review of the denial of a preliminary injunction is "appropriately more exacting where the action sought to be enjoined concerns the President . . . in view of '[t]he high respect that is owed to the office of the Chief Executive,'" Maj. Op. at 11 (quoting *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 385 (2004)). We disagree, however, as to

5

the preliminary injunction standard to be applied. In my view, a preliminary injunction may issue in a case of this sort when a movant has demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation, plus a balance of hardships tipping decidedly in that party's favor, that the public interest favors an injunction, and that the movant, as here, will otherwise suffer irreparable harm. *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010).

And as to the merits showing, I respectfully disagree with the majority's determination that the Plaintiffs' constitutional arguments and those raised by the United States as amicus curiae are *insubstantial*—not sufficiently serious for closer review.[4] Maj. Op. at 89–98. I cannot accept the majority's conclusions that "this case does not concern separation of powers," *id*. at 89, and that there is "minimal at best" risk of distraction to this and future Presidents from legislative subpoenas of this sort, *id.* at 97. Instead, I conclude that the Plaintiffs have raised serious

---

[4] Given my determination herein that the Plaintiffs have made a showing of "serious questions" as to the merits and that this case must be remanded, I need not now address whether the Plaintiffs have also satisfied the "likelihood of success" standard— and I do not do so, given the obligation in this context to avoid unnecessary judicial determinations on constitutional questions implicating Congress's investigative powers. *See Rumely*, 345 U.S. at 46. I note, however, that I do not concur in the majority's determination that as to the *present* reach of these subpoenas, the Plaintiffs have shown no likelihood of success.

questions on the merits, implicating not only Congress's lawmaking powers, but also the ability of this and future Presidents to discharge the duties of the Office of the President free of myriad inquiries instigated "more casually and less responsibly" than contemplated in our constitutional framework. *Rumely*, 345 U.S. at 46.

Nor do I agree with the majority's determination substantially to affirm the judgment and order compliance with these subpoenas. The majority itself recognizes that these broad subpoenas cannot be enforced *precisely* as drafted because they call for the production of material that may either bear "an attenuated relationship" to *any* legislative purpose or that "might [even] reveal sensitive personal details having *no* relationship to the Committees' legislative purposes." Maj. Op. at 84 (emphasis added). The majority remands for a culling process pursuant to which information disclosing, for instance, the payment of medical expenses would be exempt from disclosure. *Id*. The majority's limited culling, however, is tightly restricted to specified categories of information, leaving out almost all "business-related financial documents" from *any* review by the district court, *id.*, irrespective of any threatened harm from disclosure, and potentially leaving out substantial *personal* information as well.

7

Indeed, given the tight limitations imposed by the majority on the district court's review, even sensitive records reflecting personal matters unrelated to any conceivable legislative purpose could potentially be disclosed.

I agree with the majority that remand is necessary. But we *disagree* as to the reasons why. I conclude that the present record is insufficient to support the majority's determination that the voluminous records of Plaintiffs sought from Deutsche Bank AG ("Deutsche Bank") and Capital One Financial Corporation ("Capital One") should at this time be produced.[5] The majority concludes in advance—before these records have been assembled—that only a select *"few documents"* will implicate privacy concerns or bear "such an attenuated relationship" to any legislative purpose that "they need not be disclosed." Maj. Op. at 85 (emphasis added). I disagree that the present record is sufficient to make that determination or to conclude, more fundamentally, where the balance of hardships lies with regard to the preliminary relief that the Plaintiffs seek. In this sensitive separation-of-powers context, serious questions have been raised as

---

[5] The Plaintiffs challenge the subpoenas as they relate to the banking records of President Donald J. Trump, his family, and his businesses—the Plaintiffs here. Trump Br. at 1. To the extent the subpoenas seek other information related to parties who are not Plaintiffs, the subpoenas have not been challenged and are not part of this appeal.

to the historical precedent for these subpoenas; whether Congress has employed procedures sufficient to "prevent the separation of power from responsibility," *Watkins*, 354 U.S. at 215, in seeking this President's personal information; and whether the subpoenas are supported by valid legislative purposes and seek information reasonably pertinent to those purposes, *see Quinn v. United States*, 349 U.S. 155, 161 (1955) (noting that Congress's power to investigate "cannot be used to inquire into private affairs unrelated to a valid legislative purpose"). These questions, like the balance of hardship question, also require further review.

As set forth herein, I would remand, directing the district court promptly to implement a procedure by which the Plaintiffs may lodge their objections to disclosure with regard to specific portions of the assembled material and so that the Committees can clearly articulate, also with regard to specific categories of information, the legislative purpose that supports disclosure *and* the pertinence of such information to that purpose. The objective of this remand is the creation of a record that is sufficient more closely to examine the serious questions that the Plaintiffs have raised and to determine where the balance of hardships lies with regard to an injunction in this case, and concerning particular categories of information. The district court acknowledged that in a routine civil case, it would

9

not have ordered the disclosures here.    The majority errs in implicitly concluding that a President has *less* protection from the unreasonable disclosure of his personal and business affairs than would be afforded any litigant in a civil case.

Only on the basis of this fuller record would I determine the question whether a preliminary injunction should have issued, and with regard to what portions of the records sought.    In reaching this conclusion, I am guided by the Supreme Court's counsel in *Rumely* that in the context of delicate constitutional issues involving limits on the investigative power of Congress, our duty is to avoid pronouncement "unless no choice is left."    *Rumely*, 345 U.S. at 46; *cf. Cheney*, 542 U.S. at 389–90 (suggesting that courts should "explore other avenues" to avoid adjudicating "overly broad discovery requests" and "unnecessarily broad subpoenas" that present "collision course" conflicts between coequal branches). Indeed, *Rumely* affirms that the duty of constitutional avoidance is "even more applicable" in the context of congressional investigations "than to formal legislation." *Rumely*, 345 U.S. at 46; *see also Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962) (recognizing duty of courts in appropriate circumstances to avoid "passing on serious constitutional questions" presented by Congress's exercise of

10

its investigative power).   Decision here may be required, but is premature on the present record.

Remand will also afford the parties an opportunity to negotiate.   This is not the essential point of the remand I propose, but efforts at negotiation in this context *are* to be encouraged, since they may narrow the scope of these subpoenas, and thus avoid judicial pronouncement on the "broad confrontation now tendered." *United States v. Am. Tel. & Tel. Co* (*AT&T I*), 551 F.2d 384, 395 (D.C. Cir. 1976).   The Plaintiffs have repeatedly sought the opportunity to negotiate.   Reply Br. at 6–7; Tr. of Oral Arg. at 17:18–19, 18:3–20, 66:7-67:2.   And the Committees, while preferring the more immediate disposition that the majority affords them, have expressed a willingness to attempt negotiation on an expedited basis if requested by this Court.[6]   Tr. of Oral Arg. at 46:8–19.

---

[6] Before this Court, counsel for the Committees stated that "[i]f this court thinks there should be negotiation . . . [p]lease make it really, really fast, because we think that Mr. Trump's statements make clear this is absolutely insincere . . . [b]ut fine, give us a day."   Tr. of Oral Arg. at 46:8-15.   Counsel for the Plaintiffs specifically affirmed in response that "I don't think there is any basis to determine that we are being insincere, and I certainly welcome, I think that we have made clear, sending this case back down for judicially refereed negotiations on whatever timeline the court thinks is appropriate is absolutely something we are willing to participate in in good faith."   Tr. of Oral Arg. at 66:21-67:2.

Referencing an October 8, 2019 letter from Pat A. Cippolone, Counsel to the President, to the Speaker of the House of Representatives and three House committee chairs (a letter that is not part of the record before us), the majority concludes that a

11

To be clear, and as set forth herein, the Plaintiffs have raised serious questions on the merits as to these subpoenas, which implicate profound separation-of-powers concerns.[7] But pending the full remand that I outline

remand for negotiation is futile because the President has prohibited certain members of the Administration from appearing in connection with the ongoing impeachment inquiry. Maj. Op. at 71–72, 72 n.66. With respect, however, this letter references only the "impeachment inquiry" and not the legislative investigations at issue here. This letter thus provides no basis for this Court to disregard the express representations of the Plaintiffs' attorney that the Plaintiffs, including the President, seek to negotiate in good faith.

[7] The majority suggests that these subpoenas do not implicate separation of powers because, *inter alia*, President Trump is not suing in his official capacity. Maj. Op. at 70. I disagree. As in *Rumely*, "we would have to be that 'blind' Court . . . that does not see what '(a)ll others can see and understand,'" not to recognize that these subpoenas target the *President* in seeking personal and business financial records of not only the President himself, but his three oldest children and members of their immediate family, plus the records of the Trump Organization and a litany of organizations with which the President is affiliated. *Rumely*, 345 U.S. at 44 (quoting *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 37 (1922)); *see also id.* (acknowledging "wide concern, both in and out of Congress, over some aspects of the exercise of the congressional power of investigation"); *cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (noting that courts are "'not required to exhibit a naiveté from which ordinary citizens are free'"(quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.))). Indeed, the Committees themselves acknowledge that "President Trump and the Trump Organization" are the focus of their investigations, *see* 165 Cong. Rec. H2698 (daily ed. Mar. 13, 2019) (statement of Rep. Waters), and that "given the closely held nature of the Trump Organization," investigation must "include [the President's] close family members," District Court Doc. No. 51 at 25–26. To be sure, Presidents are not immune from legislative subpoenas. But as I explain below, this dragnet around the President implicates separation-of-powers concerns for this and future Presidents, supporting a remand as to all the Plaintiffs here. To the extent that certain of the requested records may ultimately be found not to implicate separation-of-powers concerns, such a determination can only properly be made following a remand for development of the record.

12

herein, I defer for now the question whether they have also shown a balance of hardships tipping decidedly in their favor. The remainder of this opinion sets out the reasons for my conclusions: (1) that the Plaintiffs have raised serious constitutional questions as to these legislative subpoenas; and (2) that the serious question formulation of the preliminary injunction standard is applicable, contrary to the majority's position.

## I

### A

To reiterate, the subpoenas here are very troubling. Congress "cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland*, 421 U.S. at 504. At the same time, ill-conceived inquiries by congressional committees "can lead to ruthless exposure of private lives in order to gather data" that is unrelated and unhelpful to the performance of legislative tasks. *Watkins*, 354 U.S. at 205. And the "arduous and delicate task" of courts seeking to accommodate "the congressional need for particular information" with the individual's "personal interest in privacy," *id.* at 198, does not grow *easier* when Congress seeks a *President's* personal information. Indeed, given the "unique

13

constitutional position of the President" in our scheme of government, *see Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992), and the grave importance of diligent and fearless discharge of the President's public duties, our task grows more difficult. *See Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982) (recognizing that distraction from public duties is "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve").

The majority disagrees. It concludes that this case "does not concern separation of powers" because the sought-after records are personal, not official, and because Congress "has not arrogated to itself any authority of the Executive Branch," nor "sought to limit any authority of the Executive Branch." Maj. Op. at 89. With respect, however, this conclusion gives too short shrift to the Supreme Court's analysis in *Clinton v. Jones*, 520 U.S. 681 (1997), on which the majority principally relies. There, the Supreme Court concluded that permitting a civil case to go forward "relat[ing] entirely to the unofficial conduct of the individual who happens to be the President" did not represent a *per se* impermissible intrusion by the federal judiciary on executive power and that the doctrine of separation of powers did not impose a *categorical rule* that all such private actions must be stayed against the President while in office. *Id.* at 701,

14

705–06. At the same time, however, the Court recognized that it is insufficient that a branch "not arrogate power to itself": "the separation-of-powers doctrine [also] requires that a branch *not impair another in the performance of its constitutional duties*." *Id.* at 701 (emphasis added) (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)); *see also Nixon v. Admin'r of Gen. Servs.*, 433 U.S. 425, 443–45 (1977). And as for the judiciary in the context of private litigation against a sitting President, "[t]he high respect that is owed to the office of the Chief Executive," the Court recognized, "though not justifying a rule of categorical immunity, is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Id.* at 707; *see also Fitzgerald*, 457 U.S. at 751–56 (noting that the "special nature of the President's constitutional office and functions," *id.* at 756, and the "singular importance," *id.* at 751, of her duties require particular "deference and restraint," *id.* at 753, in the conduct of litigation involving the President).

The majority concludes that legislative subpoenas to third parties targeting a President's personal or financial information, however broad and tangentially connected to any legislative purpose, do not seriously implicate separation of powers on the theory that "any concern arising from the risk of distraction in the

15

performance of the [President's] official duties is minimal," Maj. Op. at 90, perhaps

less than that, *id.* at 103–05, at least as compared to the potential burden of standing

trial in a civil case while President, which *Jones* held is not categorically prohibited

by separation-of-powers concerns.[8] But this analysis is flawed in two key

respects.

First, the *Jones* Court concluded that the burden in that case—namely, a civil

suit against the President while in office—did not categorically constitute a

"constitutionally forbidden impairment of the Executive's ability to perform its

constitutionally mandated functions" in light of the long history of judicial review

of executive action and of presidential amenability to judicial process. 520 U.S.

at 702; *see also id.* at 701–06. In assessing the separation-of-powers issue, the Court

---

[8] The majority also relies on the fact that President Trump seeks a preliminary injunction in his individual capacity, not his official capacity, and that the United States has filed an amicus curiae brief rather than a motion to intervene in asserting its view that this case presents "thorny constitutional questions involving separation of powers" and that the district court's order should be reversed. Brief of United States as Amicus Curiae at 27; *see* Maj. Op. at 91 n.76. In *Jones* itself, however, President Clinton proceeded in his individual capacity and the United States filed an amicus brief addressing its separation-of-powers concerns. The Court nonetheless noted that "[t]he representations made on behalf of the Executive Branch as to the potential impact" of a rule permitting private litigation to proceed against a sitting President "merit . . . respectful and deliberate consideration," 520 U.S. at 689–90, and concluded, as already observed, that as to any civil action regarding personal conduct permitted to proceed, "the conduct of the entire proceeding, including the timing and scope of discovery," should be informed by respect for the Office of Chief Executive, *id.* at 707.

heavily weighed the pragmatic accommodation between the judiciary and the executive demonstrated by longstanding interbranch practice. *See id.* at 704–05 (discussing historical practice and the manner in which the judiciary has permissibly burdened the Executive Branch). It directed inferior courts that even as it rejected a rule of categorical immunity, the President's unique role in the constitutional framework should inform the entire conduct of any civil action, *id.* at 707, and that "the availability of sanctions" would "provide[] a significant deterrent to litigation directed at the President in his unofficial capacity for purposes of political gain or harassment," *id.* at 708–09. The *Jones* Court was thus solicitous of separation-of-powers concerns in the context of litigation over a President's personal conduct; moreover, it continued a long tradition of placing "great weight" on historical practice in addressing questions "concern[ing] the allocation of power between two . . . branches of Government," *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).[9]

---

[9] The high value placed on historical practice "is neither new nor controversial." *Noel Canning*, 573 U.S. at 525. James Madison observed that a "regular course of practice" could "liquidate & settle" constitutional meaning in the face of "difficulties and differences of opinion" involved in the practice of government under the Constitution. James Madison, Letter to Spencer Roane (Sept. 2, 1819), *in* 8 *Writings of James Madison* 450 (Gaillard Hunt ed., 1908)); *see also Noel Canning*, 573 U.S. at 525 (collecting cases stating

17

Here, the parties have not identified, and my own search has failed to unearth, *any* previous example, in any previous Congress, of a standing or permanent select committee of the House of Representatives or the Senate using compulsory process to obtain documents containing a President's personal information from a third party in aid of legislation. Trump Br. at 14; Tr. of Oral Arg. at 34:24–35:4. Historical practice instead suggests that, on the few past occasions on which a President's personal documents have been subpoenaed from third parties, such requests have emanated either from a special committee established and authorized to pursue a specific, limited investigation or from a committee proceeding under the impeachment power.[10] It is possible that a

the relevance of past practice to separation-of-powers issues).

[10] President Andrew Johnson had his personal bank records examined as part of his impeachment, but those records appear to have been relevant because of personal loans made to him by the Treasury Department. *See* Stephen W. Stathis, *Executive Cooperation: Presidential Recognition of the Investigative Authority of Congress and the Courts*, 3 J.L. & Pol. 183, 219 (1986); *see also* Michael Les Benedict, *The Impeachment of President Andrew Johnson, 1867–68, in* 1 *Congress Investigates: A Critical and Documentary History* 254, 264–68 (Roger A. Bruns et al. eds., rev. ed. 2011). President Clinton may have had some financial information, or at the very least some financial information of then–First Lady Hillary Clinton, examined by the Whitewater Special Committee, though it appears to have been turned over voluntarily. *See* S. Rep. No. 104-280, at 155–61 (1996). The House and Senate Banking Committees also appear to have subpoenaed witnesses to testify regarding Whitewater and the death of Vince Foster; however, they do not appear to have subpoenaed the President's personal financial information. *See* Stephen Labaton, *The Whitewater Affair: The Hearing; House Committee Told of Contacts Over Whitewater*, N.Y. Times, July 27, 1994, at A1 (describing testimony); Raymond W. Smock,

18

contrary example exists. But the historical precedent for the congressional

subpoenas here, in contrast to the judicial processes assessed in *Jones*, is sparse at

best, and perhaps nonexistent.[11]   And this paucity of historical practice alone is

---

*The Whitewater Investigation and Impeachment of President Bill Clinton, 1992–98, in* 2 *Congress Investigates: A Critical and Documentary History*, *supra*, at 1041, 1044–45.   President Nixon voluntarily disclosed several years of tax returns to a House Committee; that same Committee used statutory authority not at issue here to procure additional information from the IRS.   *See* S. Rep. No. 93-768, at 1–3 (1974); Memorandum from Richard E. Neal, Chairman, to the Members of the H. Comm. on Ways and Means 3 (July 25, 2019), https://perma.cc/UYZ2-QTCU.   Other investigations do not appear to have involved either subpoenas of the President's personal financial information or subpoenas to third parties to obtain documents concerning the President in a personal capacity.   *See generally* Stathis, *supra*.

[11] Notably, the dearth of historical practice here may be partially attributable to the fact that "[t]he authority to issue a subpoena was once delegated from the full House to its committees very sparingly because the power appears long to have been deemed too serious a matter for general delegation."   Todd David Peterson, *Contempt of Congress v. Executive Privilege*, 14 U. Pa. J. Const. L. 77, 106 (2011) (internal quotation marks and citation omitted).   It appears that the House did not authorize standing committees to issue subpoenas until 1975.   *Id.* at 107.   Moreover (and more generally), it should also be noted that disputes between the two elected branches over congressional subpoenas have historically been resolved through a process of direct negotiation and accommodation between these two branches, undertaken *outside* the supervision of the federal courts.   *See, e.g., Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 56–57 (D.D.C. 2008) (noting that "negotiation and accommodation . . . most often leads to resolution of disputes between the political branches" and "strongly encourag[ing] the political branches to resume their discourse and negotiations in an effort to resolve their differences constructively").   The majority rejects this approach due to its view that this case does not involve separation of powers, Maj. Op at 69–73; however, given the expressed willingness of the parties to negotiate and my view that separation-of-powers concerns are present here, the traditional practice of further negotiation is a viable resolution.

reason for courts to pause in assessing this dispute between a President and two House committees.[12]

The second flaw in the majority's analysis lies in its assumption that third-party subpoenas of this sort pose, at best, "minimal" risk of distraction to this and future Presidents. Maj. Op. at 90. Contrary to the majority's suggestion, it is not at all difficult to conceive how standing committees exercising the authority to issue third-party subpoenas in aid of legislation might significantly burden presidents with myriad inquiries into their business, personal, and family affairs. *See Watkins*, 354 U.S. at 205 (recognizing potential for "ruthless exposure of private lives" by committees seeking information "neither desired by the Congress nor useful to it"); *cf. Jones*, 520 U.S. at 701–02 (considering the likelihood that frivolous civil litigation against the President could overly burden the Executive Branch). *Jones* relied on the relative rarity of civil litigation against past presidents to discount concerns of distraction, *see* 520 U.S. at 702, but the subjects on which

---

[12] This Court's recent decision in *Trump v. Vance*, 941 F.3d 631 (2d. Cir. 2019), is not to the contrary. The *Vance* panel explicitly relied on the "long-settled" amenability of presidents to judicial process, and in particular to subpoenas issued as part of a criminal prosecution, to inform its holding that the state grand jury subpoena to a third-party custodian of the President's tax returns at issue in that case was lawful. *See id.* at 640 (discussing the historical practice of ordering presidents to comply with grand jury subpoenas). Here, there is no such longstanding practice, and the subpoenas in question were not issued by a grand jury as part of a criminal investigation.

20

legislation might be had are vast.[13] And the risk of undue distraction from ill-conceived inquiries might be particularly acute today, in an era in which (as the Supreme Court and individual Justices have repeatedly acknowledged) digital technologies have lodged an increasingly large fraction of even our most intimate information in third-party hands. *See, e.g., Riley v. California*, 573 U.S. 373, 395 (2014) (discussing how "Internet search and browsing history" can "reveal an individual's private interests or concerns"); *Carpenter v. United States*, 138 S. Ct. 2206, 2261 (2018) (acknowledging "powerful private companies" collecting "vast quantities of data about the lives of ordinary Americans") (Alito, J., dissenting); *United States v. Jones*, 565 U.S. 400, 417 (2012) (noting that in the digital age, "people

---

[13] To be clear, while civil litigation against sitting presidents is unusual, presidents are routinely the subjects of congressional investigation while in office—as they must be, and for appropriate reasons. But there is no substantial historical precedent for the use of subpoena power to obtain a President's personal information from a third party in aid of legislation. And as to such subpoenas, there is no analogue for the possibility of sanctions in the civil litigation context, which the *Jones* Court relied on as "provid[ing] a significant deterrent to litigation directed at the President in his unofficial capacity for purposes of political gain or harassment." 520 U.S. at 708–09. Nor do established rules of procedure provide a mechanism for narrowing congressional subpoenas so as to avoid "embarrassment, oppression, or undue burden." Fed. R. Civ. P. 26(c)(1). Historically, in those few instances in which investigators have sought a President's personal documents, Congress has instead typically proceeded pursuant to the *political* checks inherent in the invocation of impeachment authority or the narrow authorization afforded to a special committee.

reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks") (Sotomayor, J., concurring).

To be clear, this is not to suggest that a President is immune from legislative subpoenas into personal matters—not at all. But as the D.C. Circuit recognized in *Trump v. Mazars* (while concluding that the House Committee on Oversight and Reform possessed authority to issue a legislative subpoena to President Trump's accounting firm), "separation-of-powers concerns still linger in the air" with regard to such subpoenas. *Trump v. Mazars USA, LLP*, 940 F.3d 710, 726 (D.C. Cir. 2019). And in such a circumstance, there is reason to conclude that courts must not only undertake the "arduous and delicate task" of "[a]ccommodat[ing] . . . the congressional need for particular information with the individual and personal interest in privacy," Maj. Op. at 51 (quoting *Watkins*, 354 U.S. at 198). They must also take on the equally sensitive task of ensuring that *Congress*, in seeking the President's personal information in aid of legislation, has employed "procedures which prevent the separation of power from responsibility," *Watkins*, 354 U.S. at 215 (discussing such procedures in the context of a threat to individual rights from congressional investigations), and which ensure due consideration to the separation-of-powers concerns that the Supreme Court identified and deemed

22

essential for *judicial* respect in *Jones.*   *See Jones,* 520 U.S. at 707 (noting that "high respect that is owed to the office of the Chief Executive," while not mandating categorical immunity from suit for private conduct while in office, should "inform the conduct of the entire proceeding, including the timing and scope of discovery"); *Cheney*, 542 U.S. at 385 (noting that President's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in conduct of litigation) (quoting *Fitzgerald*, 457 U.S. at 753 (alteration in *Cheney*)).

B

These subpoenas are deeply problematic when considered against the backdrop of these separation-of-powers concerns.   In fact, this much is evident from even cursory consideration of the differences between the present case and *Mazars*, the only other precedent directly addressing a legislative subpoena served on a third party and seeking a President's personal financial information.[14]   In *Mazars*, the D.C. Circuit recently upheld a legislative subpoena directed at the

---

[14] As noted at the outset, *see supra* page 5, the parties are unable to cite any Congress before this one in which a standing committee of the House of Representatives has issued a third-party subpoena for documents targeting a President's personal information solely in aid of legislation.   The practice appears to have begun with the committees of *this* House of Representatives, which has issued such subpoenas repeatedly, thus raising the separation-of-powers concerns discussed herein.

President's accounting firm, concluding that it had properly issued in connection with the consideration of changes to laws relating to financial disclosures required of Presidents.[15]  *Mazars*, 940 F.3d at 748.  At the same time, the *Mazars* Court pointedly suggested that the articulation of just *any* rationale for concluding that a sitting President's personal information might inform a committee in considering potential legislation is not enough to state a valid legislative purpose:

> Just as a congressional committee could not subpoena the President's high school transcripts in service of an investigation into K-12 education, nor subpoena his medical records as part of an investigation into public health, it may not subpoena his financial information except to facilitate an investigation into *presidential* finances.

---

[15] Judge Rao dissented, concluding that even assuming the Committee on Oversight and Reform had a legislative purpose, it had also asserted an intent to determine "whether the President broke the law," an inquiry that "must be pursued through impeachment," and not via Congress's authority to investigate for legislative purposes.  *Mazars*, 940 F.3d at 748 (Rao, J., dissenting).  In the instant case, given the need for remand here, I need not now determine whether the House Committees have avowed such an intent, so I have no occasion to consider the arguments raised in Judge Rao's thorough analysis.  However, it is worth noting that nowhere in the *Mazars* majority or Judge Rao's extensive discussion of historical practice, *id.* at 718–24 (majority opinion), 757–67 (Rao, J., dissenting), is there any hint of a prior occasion on which a standing or permanent select committee has used compulsory process to obtain documents targeting a President's personal information from a third party justified solely on the basis of future legislation.

*Id.* at 733. Key to the result in *Mazars*, then (and assuming, *arguendo*, that it was correctly decided) was the majority's conclusion that there was "no inherent constitutional flaw in laws requiring Presidents to publicly disclose financial information" and that the subpoena on its face thus properly sought relevant information "about a subject on which legislation may be had." *Id.* at 737 (quoting *Eastland*, 421 U.S. at 508).

This case is significantly different, at least as to the subpoenas issued by the Committee on Financial Services. This Committee seeks a universe of financial records sufficient to reconstruct over a decade of the President's business and personal affairs, not in connection with the consideration of legislation involving the Chief Executive, but because the President, his family, and his businesses present a "*useful case study*," according to the Committee, for an inquiry into the lending practices of *institutions such as Deutsche Bank and Capital One*.[16] District Court Doc. No. 51 at 25. More specifically, the Committee is investigating

---

[16] The Capital One subpoena, moreover, seeks the President's personal and business financial records starting from the exact date on which he became the Republican nominee for President—an unusual date, to be sure, for specifying the precise moment at which his banking records became a useful point of inquiry into the possibility of tightening up the regulation of lending practices with potentially "broad effects on the national economy." District Court Doc. No. 51 at 25.

"whether existing policies and programs at financial institutions are adequate to ensure the safety and soundness of lending practices and the prevention of loan fraud," *id.* at 12, as well as "industry-wide compliance with banking statutes and regulations, particularly anti-money laundering policies," *id.* at 13. The Committee urges that "[b]ecause of his prominence, much is already known about Mr. Trump, his family, and his business, and this public record establishes that they serve as a useful case study for the broader problems" under its consideration.[17] *Id.* at 25. The majority endorses this statement of legislative purpose and intimates (albeit with no evidence in the record before us) that past transactions between Deutsche Bank and the President in his pre-presidential business life may have violated banking regulations and that "no other bank would extend credit" to President Trump. Maj. Op. at 73 n.67, 74.

To be sure, legislative subpoenas issue not when all is known, but on the reasonable theory that "[a] legislative body cannot legislate wisely or effectively"

---

[17] The House Financial Services Committee asserts that the subpoenas' objective can be derived in part from House Resolution 206, which affirms that the House "supports efforts to close loopholes that allow corruption, terrorism, and money laundering to infiltrate our country's financial system." H.R. Res. 206, 116th Cong. (2019). House Resolution 206, however, does not materially aid in defining more clearly the reasons for the Committee's "case study" approach, as it does not call for a congressional investigation, much less one by a designated committee, nor does it reference the President and his family.

without obtaining "information respecting the conditions which the legislation is intended to affect or change." *Eastland*, 421 U.S. at 504 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) (alteration in *Eastland*)). But the rationale proffered for these subpoenas of the House Financial Services Committee falls far short of demonstrating a clear reason why a congressional investigation aimed generally at closing regulatory loopholes in the banking system need focus on over a decade of financial information regarding this President, his family, and his business affairs.[18] Nor does the proffered rationale reveal how the broad purposes pursued by the Committee are consistent with the granular detail that these subpoenas seek. *See Watkins*, 354 U.S. at 204 (noting the troubling tendency of some legislative investigations to "probe for a depth of detail . . . removed from any basis of legislative action" and to "turn their attention to the past to collect minutiae on remote topics").

---

[18] Thus, the majority references the fact that Deutsche Bank "has been fined in connection with a $10 billion money laundering scheme." Maj. Op. at 73 n.67. But the record is devoid of any *claim*, much less any evidence, that this fine had anything at all to do with the President, his children, his business organizations, or his business associates, all of whom will be irreparably harmed by the majority's endorsement of the "case study" approach of the House Financial Services Committee.

This is a reason for pause. As suggested by Judge Katsas in his dissent from the denial of rehearing in banc in *Mazars*, the "uncompromising extension of *McGrain v. Daugherty*" to this new context raises the serious question whether future Presidents will be *routinely* subject to the distraction of third-party subpoenas emanating from standing committees in aid of legislation—a practice for which there is scant historical precedent, as already discussed. *Trump v. Mazars USA,* LLP, No. 19-5142, 2019 WL 5991603, at *1 (D.C. Cir. Nov. 13, 2019) (Katsas, J., dissenting from the denial of rehearing en banc). Some case study rationale (in this instance, to learn whether regulators were adequately equipped to scrutinize Deutsche Bank's and Capital One's lending practices in relation to the President before he obtained the Office of Chief Executive) will *always* be present. But the regular issuance of third-party legislative subpoenas by single committees of one House of Congress targeting a President's personal information would be something new, potentially impairing public perceptions of the legislative branch by fueling perceptions that standing committees are engaged, not in legislating, but in opposition research.[19] More relevant here, such investigative practices by

---

[19] Such subpoenas, moreover, will inevitably result, as here, in recourse to the courts, potentially embroiling them, as well, in political battles between committees of Congress and the President.

Congress, undertaken "more casually and less responsibly" than is the constitutional ideal, *see Rumely*, 345 U.S. at 46, pose a *serious* threat to "presidential autonomy and independence," *Mazars*, 2019 WL 5991603, at *1 (Katsas, J., dissenting from the denial of rehearing en banc).   And this is a substantial concern in our constitutional scheme, which relies on the proposition that the occupant of the Office of Chief Executive is positioned to "'deal fearlessly and impartially with' [its] duties," even as Presidents may be "easily identifiable target[s]" of legal process, personally vulnerable by virtue of the "visibility of [the] office and the effect of [their] actions on countless people."   *Fitzgerald*, 457 U.S. at 752–53 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)).

To be sure, the third subpoena to Deutsche Bank, which is identical to the Deutsche Bank subpoena issued by the Committee on Financial Services, emanates from the Permanent Select Committee on Intelligence and is more closely linked to the consideration of legislation related to the Office of the Chief Executive and to this President's affairs, as a recent candidate.[20]   The majority is correct,

---

[20] As the majority states, the Chair of the Intelligence Committee has publicly affirmed that the Committee is investigating matters related to interference by the Russian government in the U.S. political process and that the information sought from Deutsche Bank will inform legislative proposals to protect this process from foreign influence.   Maj. Op at 62–64.   The House Intelligence Committee, moreover, has an oversight function to which its subpoena could conceivably relate.   At the same time,

moreover, that once presented with adequate evidence of legislative authorization and purposes, it is not the province of courts to inquire into legislators' motives, *see* Maj. Op. at 50–51, and that "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Watkins*, 354 U.S. at 200.

At the same time, as the majority also affirms, the record must provide "sufficient evidence of legislative authorization and purposes to enable meaningful judicial review." Maj. Op. at 55. And this is particularly the case when a congressional investigation even *potentially* trenches upon constitutional

---

however, no House resolution appears specifically to reference this investigation, at least as it relates to efforts to seek the President's financial information, nor is such a legislative purpose easy to square with the extraordinary breadth of the Deutsche Bank subpoenas. The Chair, moreover, has also affirmed that the Committee's investigation is in furtherance of Congress's duty to "ensure that U.S. officials—including the President—are serving the national interest and, if not, are held accountable." Press Release, Permanent Select Comm. on Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6, 2019), bit.ly/2UMzwTE. The Plaintiffs argue that the subpoena is thus not in furtherance of legislative purposes, but represents an effort by the Committee to itself conduct intelligence and law enforcement activities. Trump Br. at 35–36. Indeed, at oral argument, the Committees' lawyer appeared explicitly to equate these subpoenas to those issued in connection with federal criminal investigations. Tr. of Oral Arg. at 59:14–60:2. While I do not decide whether the Intelligence Committee has affirmatively avowed an improper purpose, the amorphous nature of the Committee's legislative purpose would be clarified by my proposed remand, as would the connection between this purpose and the particular disclosures that are sought.

limits on Congress's investigative power. *See Rumely*, 345 U.S. at 46 (noting that such limits should be identified by courts only after "Congress has . . . unequivocally authoriz[ed] an inquiry of dubious limits"). Indeed, in such circumstances, the Supreme Court has made clear that courts are to look to the "instructions to an investigating committee," as "embodied in the authorizing resolution," to ascertain whether the legislative assembly has "assay[ed] the relative necessity of specific disclosures." *Watkins*, 354 U.S. at 201, 206. Considered in light of the separation-of-powers concerns that persist with regard to these subpoenas, the Plaintiffs have raised a serious question on this front as well.

As to both the House Financial Services *and* Intelligence Committee subpoenas, there is an open question as to whether these subpoenas have been authorized by the House of Representatives in a manner permitting this Court to determine whether they are "in furtherance of . . . a legitimate task of the Congress." *Watkins*, 354 U.S. at 187. As the *Watkins* Court explained, "[t]he theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose" and that "the House or Senate shall have instructed the committee

31

members on what they are to do with the power delegated to them." *Id.* at 200–01. The majority acknowledges *Watkins*'s requirement that an authorizing resolution "spell out [an investigating committee's] jurisdiction and purpose with sufficient particularity" as to ensure that "compulsory process is used only in furtherance of a legislative purpose." *Id.* at 201; *see* Maj. Op. at 51, 79–80. Critically, moreover, the majority itself recognizes that "[i]t is not clear whether this passage can be satisfied" with regard to these subpoenas by the principal instruction in place here, at the time the subpoenas issued: namely, the instruction "that the House gives to a committee pursuant to a House rule defining a standing committee's continuing jurisdiction." Maj. Op. at 52–53.

The majority treats House Resolution 507 as the cure-all solution to this key uncertainty, rejecting the Plaintiffs' argument that it is not properly considered on the subject of legislative authorization and purposes because it issued after the subpoenas themselves.[21] But House Resolution 507 falls far short of a specific

---

[21] The majority's support for this conclusion derives solely from cases discussing, in the contempt prosecution context, what evidence may be considered in evaluating whether a question posed to a witness before a congressional committee was pertinent to an investigation's inquiry. *See Watkins*, 354 U.S. at 201–02; *Rumely*, 345 U.S. at 48; *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963); *see also* Maj. Op. at 54–58. This issue is distinct from the threshold question of whether a committee is adequately authorized, so that the majority must necessarily reason by analogy, and its conclusion is far from inevitable, particularly in the context of third-party subpoenas aimed at a President's

32

"authorizing resolution" issued to make clear that a designated committee is to undertake an investigation on a particular subject within its domain.   To be sure, *McGrain* found sufficient a resolution that did not "in terms avow that it [was] intended to be in aid of legislation," on the theory that "the subject-matter was such that [a] presumption should be indulged" that legislating "was the real object."   273 U.S. at 177–78.   But in a context like this, presenting serious constitutional concerns, courts "have adopted the policy of construing . . . resolutions . . . narrowly, in order to obviate the necessity of passing on serious constitutional questions."   *Tobin*, 306 F.2d at 274–75.   And this resolution on its face discusses none of the subpoenas here, nor even the work of the committees from which they issued.   Instead, House Resolution 507 authorizes *any* subpoena, by any standing or permanent select committee, already issued *or in the future to be issued*, so long as it concerns the President, his family, or his business entities and organizations:

---

personal information, where the President must be able efficiently (and without undue distraction) to determine what, if any, steps she should take, either to assist the inquiry or, as here, to litigate.   I need not address this question, however, because, even assuming that Resolution 507 is properly considered, a serious question remains as to whether it constitutes what the majority acknowledges is required: "sufficient evidence of legislative authorization and purposes to enable meaningful judicial review."   Maj. Op. at 55.

Resolved, That the House of Representatives ratifies and affirms all current and future investigations, as well as all subpoenas previously issued or to be issued in the future, by any standing or permanent select committee of the House, pursuant to its jurisdiction as established by the Constitution of the United States and rules X and XI of the Rules of the House of Representatives, concerning or issued directly or indirectly to —

> (1)     the President in his personal or official capacity;
>
> (2)     his immediate family, business entities, or organizations;
>
> . . .
>
> (9) any third party seeking information involving, referring, or related to any individual or entity described in paragraphs (1) through (7).

H.R. Res. 507, 116th Cong. (2019); *see also* H.R. Res. 509, 116th Cong. § 3 (2019)

("House Resolution 507 is hereby adopted").

By purporting to authorize third-party subpoenas for any and all past and future investigations into the President's personal and official business, Resolution 507 would appear to run directly into the primary concern in *Watkins* that "[b]roadly drafted and loosely worded" resolutions can "leave tremendous latitude to the discretion of investigators," 354 U.S. at 201, and thus permit committees "in essence, to define [their] own authority," *id.* at 205. As *Watkins* emphasized, "[a]n essential premise" underlying the investigatory powers of a congressional committee to compel the production of documents or attendance by an individual "is that the House or Senate shall have instructed the committee

34

members on what they are to do with the power delegated to them." *Id.* at 201. Absent that instruction, such subpoenas defy judicial review, the *Watkins* Court understood, because "it is impossible . . . to declare that [a committee] has ranged beyond the area committed to it by its parent assembly." *Id.* at 205.

To be clear, *Watkins* addressed this problem in the context of a House proceeding implicating a private citizen's constitutional liberties, and not separation of powers. But its caution is still relevant: that "excessively broad charter[s]" to investigating committees make it difficult, if not impossible, for courts "to ascertain whether any legislative purpose justifies the disclosures sought and, if so, the importance of that information to the Congress in furtherance of its legislative function." *Id.* at 205–06. With respect, the majority thus errs in dismissing the Department of Justice's concern that the blank-check approach adopted here to authorizing third-party subpoenas seeking personal information about the President and his family represents "a failure of the House to exercise 'preliminary control of the Committee[s],'" *see* Brief of United States as Amicus Curiae at 19 (quoting *Watkins*, 354 U.S. at 203)—a failure which not only throws into question the adequacy of authorization in this case, but which also raises significant issues for the future regarding interbranch balance and the ability of

35

this and future Presidents to perform their duties without undue distraction, *id.* at 5–7; *see Jones,* 520 U.S. at 690 (noting that "representations made on behalf of the Executive Branch as to the potential impact" of inquiries on the Office of the President "merit our respectful and deliberate consideration"). [22]    In short, Resolution 507 itself, given its retrospective and prospective nature, and its purported authorization of any and all third-party committee subpoenas seeking not only official, but personal information about the President, his family, and his businesses, presents a serious question as to whether the House has discharged its

---

[22] The Department of Justice argues that a clear statement rule should apply to the authorization of legislative subpoenas seeking a President's personal information.    Brief of United States as Amicus Curiae at 10.    The majority dismisses this argument, noting that neither *Franklin v. Massachusetts*, 505 U.S. 788, nor *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991), on which the Department relies, concern congressional subpoenas, but *statutes* "claimed to limit presidential power."    Maj. Op. at 89.    But *Rumely* makes clear that the duty of constitutional avoidance (implemented, in part, through mechanisms such as clear statement rules) "is even more applicable" in the context of congressional investigations than in the interpretation of statutes.    345 U.S. at 46.    It also affirms that "[w]henever constitutional limits upon the investigative power of Congress have to be drawn . . . , it ought only to be done after Congress has demonstrated its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits."    *Id.*    In short, while I need not at this time reach the question, the Department's clear statement argument merits serious consideration, as does its assertion that the House's "blank-check" approach to use of compulsory process directed at the President, his family, and his businesses runs afoul of *Watkins*'s caution that "[a] measure of added care on the part of the House and the Senate in authorizing the use of compulsory process" would help "prevent the separation of power from responsibility."    354 U.S. at 215.

"responsibility . . . in the first instance, to insure that compulsory process is used only in furtherance of a legislative purpose."  *Watkins*, 354 U.S. at 201.

## II

These third-party legislative subpoenas thus raise serious questions on the merits, implicating substantial separation-of-powers concerns.   In such a context, *Rumely*'s caution kicks in, which "counsel[s] abstention from adjudication unless no choice is left."   345 U.S. at 46.   The majority disagrees, asserting that even assuming serious questions regarding the separation of powers have been raised, affirmance here is still required because our "serious questions" approach to whether a preliminary injunction should issue is unavailable in the context of these third-party legislative subpoenas.[23]   I have already outlined my disagreement

---

[23] The majority also argues that any serious questions presented here "are properly rejected at this stage of the litigation" because they "involve solely issues of law."   Maj. Op. at 101.   I disagree.   As an initial matter, our case law has recognized that, in appropriate circumstances, purely legal issues can present sufficiently serious questions to warrant a preliminary injunction.   *See, e.g.*, *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1339–40 (2d Cir. 1993) (finding sufficiently serious questions going to the merits based on the novel questions of law presented by plaintiffs' claims), *judgment vacated as moot by Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918 (1993); *see also, e.g.*, 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.3 (3d ed.) (Westlaw) (database updated August 2019) (referring to "the existence of a factual conflict, *or* of difficult questions of law," as components of the merits showing in the preliminary injunction context (emphasis added)).   Moreover, the majority itself is remanding for some development of the factual record.   As set forth herein, I conclude that the majority's limited remand is inadequate, and that the record

with the majority's determination that "this case does not concern separation of powers," Maj. Op. at 89, and that the questions raised, even if "serious in at least some sense, lack merit," *id*. at 101.   I also disagree as to the supposed unavailability of our traditional preliminary injunction approach.   Indeed, I conclude, with respect, that the majority badly errs in deciding that this approach is unavailable in the sensitive context of challenges to congressional subpoenas.

As the Supreme Court made clear in *Winter v. Natural Resources Defense Council, Inc.*, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."   555 U.S. 7, 20 (2008).   The majority acknowledges that, as to the required merits showing, we have repeatedly said in this Circuit that "district courts may grant a preliminary injunction where a plaintiff . . .   meets either of two standards:   '(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation.'"   Maj. Op. at 11–12 (quoting *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019)).   When a plaintiff has demonstrated only "serious

needs further factual development *before* the legal issues here can be adequately assessed.

38

questions" as to the merits, however, the plaintiff has a higher burden as to the third element: he must show that the balance of hardships tips *decidedly* in his favor. *See Kelly*, 933 F.3d at 184; Maj. Op. at 11–12. The majority also acknowledges that we have reaffirmed our traditional approach in the wake of the Supreme Court's decision in *Winter*. *See Citigroup*, 598 F.3d at 38 ("hold[ing] that our venerable standard for assessing a movant's probability of success on the merits remains valid").[24] Irreparable harm is not in question in this case, moreover, because, *inter alia*, the Plaintiffs have an interest in keeping their banking records private from Congress and neither House committee will commit to treating any portion of the voluminous personal and business records that they seek as confidential. J.A. at 122–23. In such circumstances, the majority and I are in agreement that compliance with these subpoenas will cause irreparable

---

[24] *Citigroup* carefully assessed *Winter*'s import and concluded that our traditional approach is wholly consistent with that precedent and is properly retained, given "[t]he value of this circuit's approach to assessing the merits of a claim at the preliminary injunction stage," which "lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup*, 598 F.3d at 35. Moreover, *Citigroup* made clear that, under either the "serious questions" or the "likelihood of success" formulation, courts in this Circuit consider all four elements articulated by the Supreme Court in *Winter*. *See id.* at 34, 38 (citing *Winter*, 555 U.S. at 20).

harm to the President, his family, his businesses, and his business associates. Maj. Op. at 13–14.

The majority asserts that a preliminary injunction is nonetheless unavailable based on our "serious questions" formulation of the merits inquiry because of the so-called "government action exception" to this formulation, as expressed by this Court's decision in *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989). I disagree. To be sure, our case law has recognized three narrowly defined situations in which a movant *cannot* obtain a preliminary injunction under the "serious questions" formulation. *See id.*; *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). But *Plaza Health*, on which the majority relies, is not applicable.

To explain my conclusion requires a step back from our traditional formulation, to set forth *why* this Circuit was correct to reaffirm our serious question approach—and, indeed, why we err today in expanding a formulaic exception to it. While sometimes styled in our case law as its own "standard," *see, e.g.*, *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014), the "sufficiently serious questions, plus a balance of hardships

40

tipping decidedly in favor of the moving party" approach is not actually a *separate* test at all, but rather a way of articulating one point on a single sliding scale that balances likelihood of success against hardship in determining whether a preliminary injunction should issue. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.3 (3d ed.) (Westlaw) (database updated August 2019) (hereinafter "Wright & Miller") (referring to the Second Circuit's "serious questions" formulation as "[p]robably the most often-quoted statement" of the sliding scale principle). Likelihood of success, while of "particular importance" in this inquiry, is not determinative, but must be considered and balanced with the relative hardship *each* side is likely to face from the determination whether an injunction issues, with the so-called "serious questions" standard emerging as simply one point on the sliding scale at which an injunction may be warranted.[25] *Id.* This flexible approach is particularly well-suited to the preliminary injunction context, where courts act pursuant to

---

[25] As Judge Frank articulated decades ago, when "the balance of hardships tips decidedly toward plaintiff," it should "ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953).

equitable principles.[26]  *See, e.g.*, *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) ("In emphasizing the need for flexibility . . . we have followed a tradition in which courts of equity have sought to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity." (internal quotation marks, alterations, and citations omitted)).

Against this backdrop, our so-called "exceptions" to the serious questions formulation are best understood not in prescriptive terms, but as the articulation of principles guiding the application of the sliding scale calculus in particular scenarios.  As relevant here, the *Plaza Health* "exception" thus reflects a considered judgment, drawing on equitable ideas, that "[w]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the serious questions formulation should be generally unavailable precisely because the balance of hardships is so unlikely to tip

---

[26] Indeed, confining preliminary injunctions to circumstances in which a plaintiff has shown there is no difficult question of law that could ultimately go against him would "deprive the remedy of much of its utility."  Wright & Miller § 2948.3; *see also Citigroup*, 598 F.3d at 35 (noting that "[p]reliminary injunctions should not be mechanically confined to cases that are simple or easy," as happens when the likelihood-of-success standard is formulaically employed).

*decidedly* in that party's favor.   *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (quoting *Plaza Health*, 878 F.2d at 580).   In issuing a preliminary injunction based on the conclusion that it *does*, a court impermissibly "substitute[s] its own determination of the public interest" for the one reflected in the statutory or regulatory scheme.   *Id.* at 132.

Accordingly, where government action has been fairly characterized as taken pursuant to a statutory or regulatory scheme, we have generally applied the likelihood-of-success standard.   *See Citigroup*, 598 F.3d at 35 n.4 (articulating the exception as limited to situations in which "a moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme").   And where movants have sought preliminarily to enjoin government action pursuant to a *federal* statutory or regulatory scheme, we have explained that in the context of such action, "developed through presumptively reasoned democratic processes" and resulting from "the full play of the democratic process involving both the legislative and executive branches," it is difficult to envision *any* circumstance in which a movant could demonstrate that the balance of hardships tips decidedly in his favor.   *Able*, 44 F.3d at 131.

The majority argues that the *Plaza Health* exception sweeps more broadly, relying for this proposition on cases involving action taken by state and local governments.[27]  *See* Maj. Op. at 15–16.  While certain of these cases did not analyze why the *Plaza Health* exception was applicable, and appear simply to have assumed that the government action in question was taken pursuant to a statutory or regulatory scheme, *see, e.g.*, *Cent. Rabbinical Cong.*, 763 F.3d at 192; *Monserrate*, 599 F.3d at 154, those that did engage with this analysis explicitly identified a statutory or regulatory scheme and accordingly concluded that the presumptive

---

[27] *See, e.g., Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (likelihood-of-success standard applied to preliminary injunction sought by religious organizations against a city ordinance based on the court's conclusion, without further analysis, that the ordinance constituted "government action taken in the public interest pursuant to a statutory or regulatory scheme" (citation omitted)); *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (same, as to a preliminary injunction seeking to unwind the expulsion of a state senator); *NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995) (likelihood-of-success standard applied to a preliminary injunction seeking to enjoin a town from hiring police officers or firefighters, based on the court's conclusion that the town acted "in the public interest" and "pursuant to established municipal regulations and state civil service laws"); *N.Y. Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036 n.7 (2d Cir. 1995) (applying likelihood-of-success standard to a preliminary injunction seeking to bar transit authority from implementing a proposed fare increase on the basis that the action in question "was to be implemented in accordance with the special powers" of the transit authority board as set forth in a state statute); *see also Molloy v. Metro. Transp. Auth.*, 94 F.3d 808, 811 (2d Cir. 1996) (relying on *New York Urban League* in applying the likelihood-of-success standard to a preliminary injunction sought against transit authority's implementation of a staff reduction plan).

44

public interest weighed against the movant, *see, e.g., NAACP*, 70 F.3d at 223; *see also, e.g., Otoe-Missouria Tribe of Indians*, 769 F.3d at 110 (determining that New York's ban on certain loans was "a paradigmatic example of governmental action taken in the public interest, one that vindicated proven policies implemented through legislation or regulations" and therefore applying the likelihood-of-success standard (internal quotation marks and citations omitted)).[28]

Where, by contrast, government action has *not* been taken pursuant to a specific statutory or regulatory scheme, the narrow *Plaza Health* exception has *not* been applied, precisely because the public interest has not been presumed to rest with a single party. This explains why this Court recently upheld the denial of a preliminary injunction sought by President Trump to restrain the enforcement of a grand jury subpoena issued by the New York County District Attorney without applying the *Plaza Health* exception in determining the applicable preliminary injunction standard. *See Trump v. Vance*, 941 F.3d 631, 639–40 (2d Cir. 2019). It explains our decision in *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1993), *judgment vacated as moot by Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918

---

[28] Such cases may also exhibit an especial hesitancy on the part of federal courts to substitute their own view of the public interest for that reached by local and state governments in light of principles of comity and federalism.

(1993), in which we applied the serious questions standard to an injunction sought against the actions of the Immigration and Naturalization Service only after rejecting the government's argument that the action was taken "pursuant to Congress'[s] broad grant of authority in the [Immigration and Nationality Act]," and reasoning that "in litigation such as is presented herein, no party has an exclusive claim on the public interest," *id; see also, e.g., Patton v. Dole*, 806 F.2d 24, 29–30 (2d Cir. 1986); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763 (2d Cir. 1988); *Mitchell v. Cuomo*, 748 F.2d 804, 806–07 (2d Cir. 1984); *cf. Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) (rejecting the Census Bureau's argument that "the public interest [rests] solely with it").

The government action at issue in the instant case plainly falls outside the current confines of the narrow *Plaza Health* exception.   Here, far from a situation in which a movant seeks to enjoin action that is the product of "the full play of the democratic process," *Able*, 44 F.3d at 131, these legislative subpoenas, with due respect, do *not* constitute governmental action pursuant to a statutory or regulatory scheme and do not reflect the presumptively public-interested actions of both the legislative and executive branches.   Rather, each subpoena is the

product of a sub-component of a single chamber of one branch of the federal government and, critically, implicates the interests of another branch.[29]

The majority's approach, which concludes that, because the Committees act pursuant to powers under the Constitution, such action should "[s]urely . . . not" be evaluated under a "less rigorous standard" than that "applied to plaintiffs seeking to preliminary enjoin state and local units of government" in cases such as *Central Rabbinical Congress* and *Monserrate*, Maj. Op. at 20–21, is misguided for two reasons. First, by deeming the "serious questions" standard to be less rigorous, the majority ignores the fact that the *ultimate* burden is equivalent under both standards.[30] More fundamentally, the majority errs by categorically extending

---

[29] Indeed, precisely because subpoenas of this sort implicate separation of powers so that neither Congress *nor* the Plaintiffs can be taken to represent the public interest with regard to their enforcement, the D.C. Circuit in *Mazars* declined to determine, in an analogous context, what deference it owed to the congressional subpoena reviewed in that case. *Mazars*, 940 F.3d at 726.

[30] As is the nature of a sliding scale, the variables move in tandem and the Plaintiffs' ultimate burden is equivalent either way. The majority perceives tension between this Court's observation in *Citigroup* that the "overall burden" of the serious questions standard is "no lighter than the one it bears under the 'likelihood of success' standard," *Citigroup*, 598 F.3d at 35, and language in our other opinions that refers to the likelihood-of-success standard as "more rigorous," *see, e.g.*, *Cent. Rabbinical Cong.*, 763 F.3d at 192. *See* Maj. Op. at 14 n.22. I disagree. Because one standard requires a more demanding showing as to the merits and a correspondingly less demanding showing as to hardship, while the other standard requires the reverse, the overall burdens are clearly equivalent. Deeming the likelihood-of-success standard to be "more rigorous" refers only to its increased rigor as to the required merits showing. It was for this reason,

47

the *Plaza Health* exception to a situation in which "no party has an exclusive claim on the public interest," *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir. 1997) (quoting *Haitian Centers*, 969 F.2d at 1339), when the so-called "government action exception" is premised entirely on the assumption that the public interest weighs decidedly *against* the movant.

To be clear, preliminary injunctions constitute an extraordinary form of relief and should not issue lightly. *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting Wright & Miller § 2948). The majority's expansion of our so-called "government action exception" into the delicate arena of congressional investigations, however, is unwise, precisely because this is a context in which flexible application of equitable principles is vital. Historically, federal courts have undertaken some of their most difficult assignments in the context of reviewing the actions of congressional committees. The Supreme Court has thus been required to take on the "arduous and delicate task" of "[a]ccommodat[ing] . . . the congressional need for particular information with the

---

among others, that we concluded in *Citigroup* that the Supreme Court's decision in *Winter* revealed "no command . . . that would foreclose the application of our established 'serious questions' standard as a means of assessing a movant's likelihood of success on the merits" against the other components required to obtain preliminary relief. 598 F.3d at 38.

individual and personal interest in privacy." *Watkins*, 354 U.S. at 198. It has been called upon to address the "[g]rave constitutional questions" presented when "the power of Congress to investigate" appears to encroach on the limits on that power imposed by the Bill of Rights and, in particular, the First Amendment. *Rumely*, 345 U.S. at 44, 48. Disputes between congressional committees and Presidents arising from subpoenas, as here, also not uncommonly require courts to "search for accommodation between the two branches"—a task for which this Circuit's flexible approach to making the difficult judgment whether a preliminary injunction should issue is particularly well-suited. *United States v. Am. Tel. & Tel. Co* ("*AT&T II*"), 567 F.2d 121, 131 (D.C. Cir. 1977).

In short, we should not deprive ourselves of our traditional approach in such a sensitive context. As we affirmed in *Citigroup*, "[r]equiring in every case a showing that ultimate success on the merits is more likely than not is 'unacceptable as a general rule,'" and also "deprive[s] the remedy of much of its utility." 598 F.3d at 35–36 (quoting Wright & Miller § 2948.3). Because this case is not squarely covered by *Plaza Health* or any other previously-articulated "exception," I conclude we are bound to (and should) undertake our usual approach: namely, to consider the Plaintiffs' showing as to the merits, balance of

49

hardships (merged here with the public interest inquiry, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)), and irreparable harm and determine whether an injunction is warranted under *either* the likelihood of success *or* serious questions standard. As set forth already, moreover, these subpoenas do, in fact, present serious questions implicating not only the investigative authority of these two House committees, but the separation of powers between Congress and the Presidency.

\*     \*     \*

Having determined that Plaintiffs have raised serious questions as to the merits, in the usual case, the next step would be to assess the balance of hardships. But this leads to my final point of departure from the majority. The majority orders immediate compliance with these subpoenas save for a "few documents that should be excluded" pursuant to its call for a restricted culling of certain records assembled under specific subpoena categories. Maj. Op. at 86. In contrast, I would not remand for the limited culling ordered by the majority, but would instead remand in full, directing that the district court assist in the development of the record regarding the legislative purposes, pertinence, privacy, and separation-of-powers issues at stake in this case.

I would request the district court on remand promptly to implement a procedure by which the Plaintiffs identify on privacy or pertinency grounds specific portions of the material assembled in response to these subpoenas for nondisclosure. Like the majority, I would then provide counsel for the Committees with an opportunity to object, but I would also require counsel, provided with a general description of such material, to articulate clearly the legislative purpose that disclosure serves and to specify how the material sought is pertinent to that purpose. Even assuming, *arguendo*, that the Committees act pursuant to adequate authorization from the House as a whole, serious questions persist as to the ends the Committees are pursuing and whether these ends are adequate to justify the sought-after disclosures.[31] A fuller record would permit a more informed calculus regarding balance of hardships and would further clarify the stakes as to the serious questions that the Plaintiffs have already raised. This full remand is superior to the majority's approach for at least three reasons.

---

[31] As to the "case study" rationale proffered by the House Financial Services Committee, for instance, if that Committee is unable more clearly to articulate the pertinence of its subpoenas to the legislative purposes it pursues, *see Watkins*, 354 U.S. at 214–15, the balance of hardships may well lie with the Plaintiffs, who will suffer irreparable harm from the disclosure of their private and business affairs.

First and most fundamentally, remand is necessary here because the present record does not permit a full assessment of either the serious questions raised by these novel subpoenas or the balance of hardships with regard to specific disclosures. The present record is wholly insufficient to support the conclusion that the voluminous material sought pursuant to these subpoenas should at this time be produced. Serious questions arising from the lack of historical precedent for these subpoenas, their questionable authorization, their legislative purposes, and the pertinence of particular disclosures remain. The record as to hardship, moreover, is sparse, and does not reflect *either* parties' concerns as to the disclosure or nondisclosure of particular categories of information sought by these extraordinarily broad subpoenas. The majority disagrees on both counts, concluding that while the questions here may be "serious," they are without merit, Maj. Op. at 100–01, and that even if the balance of hardships tips in Plaintiffs' favor, it does not do so "decidedly," Maj. Op. at 102. For the reasons already expressed, however, I cannot join in this assessment.

Next (and notably), a broader remand is necessary here, even taking the majority on its own terms—even assuming (incorrectly) that the district court's judgment could be substantially affirmed on the present record. This is because

52

the majority's remand is inadequate to address the privacy and pertinency concerns that the majority *itself* identifies and deems important. As to sensitive personal information and an unspecified category of "nonpertinent" material, the majority concludes that the Plaintiffs should be afforded an opportunity to object to disclosure on privacy and pertinency grounds. It notes that "[t]he Committees have advanced no reason why the legislative purposes they are pursuing require disclosure" of "payment for anyone's medical expenses," for instance, and the majority thus forbids it. Maj. Op. at 84. But by providing the Plaintiffs with an opportunity to object only as to limited, specific categories of information sought pursuant to these subpoenas, the majority creates the very potential for unwarranted disclosure of sensitive information that it purports to disallow. The majority thus orders compliance with, for instance, the Deutsche Bank subpoena's demand for "any document related to any domestic or international transfer of funds in the amount of $10,000 or more," including any "check," J.A. at 38, providing *no* opportunity for Plaintiffs to object that the sought-after material is sensitive and related to no legislative purpose at all.

Perhaps there is no material responsive to this category that would trigger Rule 26(c)(1)'s protections against "embarrassment, oppression, or undue burden"

in a routine civil case.   Fed. R. Civ. P. 26(c)(1).   Perhaps such material *does* exist. We cannot know until the documents are assembled and objections are made. The privacy and pertinency concerns that the majority *purports* to address simply *cannot* be addressed in the abstract.   And by declining a full remand to permit a record to be made, the majority affords *less* protection against the unwarranted disclosure of personal information regarding a sitting President and his family than would be afforded to any litigant in a civil case.

Finally, I also disagree with the majority's implicit assessment that the Plaintiffs have demonstrated no stake in the privacy of their business-related information that merits further review.   Indeed, to the extent that the majority *does* show a reasonable concern for the needless disclosure of Plaintiffs' private and nonpertinent information, this concern does not generally extend to private *business* information at all, even though such information may implicate the same issues of privacy and (non)pertinence.   To be sure, the majority is correct that Congress must have the ability to investigate businesses (even closely-held ones) in aid of legislation.   And such investigations, serving a public good, will sometimes cause competitive harm.[32]   But particularly in light of the very broad

---

[32] Federal Rule of Civil Procedure 26(c)(1)(G) permits a district court to issue

54

disclosure sought by these subpoenas (which, with regard to many transactions, could require the production of information from both this year and from *decades* ago), the majority has proffered no clear reason for denying the Plaintiffs an opportunity to object more generally to the disclosure of such material.

The majority argues that any hardship from business disclosures is offset in this case by the fact that Presidents already "expose for public scrutiny a considerable amount of personal financial information pursuant to the financial disclosure requirement of the Ethics in Government Act, 5 U.S.C. app. §§ 101-111." Maj. Op. at 102. But this is beside the point—or perhaps makes the point that the majority's approach is problematic.

Public disclosures made pursuant to the Ethics in Government Act are required by law, pursuant to a statute that has run the gantlet of bicameralism and presentment. In making disclosures pursuant to this Act, a President complies with a statute that presumptively reflects a democratically enacted consensus

___

protective orders to prevent public disclosure of "confidential . . . commercial information," a protection not afforded or offered to the Plaintiffs by the Committees here. The majority does not include these competitive harms as "irreparable injuries" in its analysis, restricting its focus only to "loss of privacy." *See* Maj. Op. at 101–02. The irreversible nature of the competitive harm risked by immediate and unconditional disclosure, and the lack of safeguards common to typical discovery procedures in civil litigation, further buttress my view that these subpoenas, as drafted, raise serious questions which a remand would aid in resolving.

55

regarding the financial disclosures that a Chief Executive should be required to make.   These House subpoenas, by contrast, require "considerably more financial information," as the majority concedes, but themselves raise substantial questions as to whether they are supported by "sufficient evidence of legislative authorization and purposes to enable meaningful judicial review."   Maj. Op. at 55, 102.   And as Judge Katsas suggested in dissent from the denial of rehearing in banc in *Mazars*, the scope of required disclosure "is determined . . . by the whim of Congress—the President's constitutional rival for political power—or even, as in this case, by one committee of one House of Congress."   *Mazars*, 2019 WL 5991603, at *1 (Katsas, J., dissenting from the denial of rehearing en banc).   In such circumstances, and taking the majority's analysis on its own terms, it is not clear why the majority limits its remand to the particular categories of information that it has selected, as opposed to permitting a more general opportunity to object regarding nonpertinent business information and the irreparable injury that will attend its disclosure.

For all the reasons that I have laid out here, this matter should be returned to the district court.   The remand that I have outlined would clarify the issues at stake so that a reasoned determination could be made as to whether serious

questions persist, and where the balance of hardships lies. Indeed, given the lack of historical precedent for these subpoenas; their extraordinary breadth; and the persistent questions here regarding authorization, legislative purposes, and pertinence, a remand for development of the record with regard to specific categories of information is far preferable to the majority's approach.

Such a procedure would also encourage negotiation between the parties and potentially narrow the scope of this dispute. Because I conclude, contrary to the majority, that this case implicates the Supreme Court's caution to "tread warily" in matters pitting the power of Congress to investigate against other substantial constitutional concerns, *Rumely*, 345 U.S. at 46, and because the "serious questions" delineated above sound in separation of powers, *see Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 466 (1989) (noting that the Supreme Court's "reluctance to decide constitutional issues is especially great where . . . they concern the relative powers of coordinate branches of government"), this matter falls within a range of cases in which we *should* attempt, if possible, to "avoid a resolution that might disturb the balance of power between the two branches," *AT&T II*, 567 F.2d at 123. Perhaps that is not possible here. But as the D.C. Circuit has recognized in the past, congressional committees and the Chief Executive "have a long history of

settlement of disputes that seemed irreconcilable" and such resolutions, where possible, are to be preferred, since "[a] court decision selects a victor, and tends thereafter to tilt the scales."  *AT&T I*, 551 F.2d at 394; *see also id.* at 391 (noting possibility of "better balance . . . in the constitutional sense" from "political struggle and compromise," rather than court decision); *Rumely*, 345 U.S. at 45–46 (noting that a "[c]ourt's duty to avoid a constitutional issue, if possible, applies not merely to legislation . . . but also to congressional action by way of resolution"— indeed, *most especially* in this context).

Accordingly, I would withhold decision as to balance of hardships and remand to permit the district court and the parties the opportunity to provide this Court with an adequate record regarding the legislative purpose, pertinence, privacy and separation of powers issues in this case.  Such a procedure, as in *AT&T I*, 551 F.2d at 394–95, and *AT&T II*, 567 F.2d at 128–32, could narrow the scope of the present dispute.  But it is required in any event, because the record simply does not support the majority's decision to order immediate compliance with these subpoenas, but for a "few documents," Maj. Op. at 85, falling within its preselected categories.  To be clear, I reach this resolution guided by the Supreme Court's admonition in *Rumely* that the outer reaches of Congress's investigative

58

power are to be identified reluctantly, and only after Congress "has demonstrated its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits." 345 U.S. at 46. Serious questions persist with regard to these subpoenas—questions demanding close review lest such novel subpoenas prove a threat to presidential autonomy not only now but in the future, and "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Fitzgerald*, 457 U.S. at 753. Once the parties have provided this Court with the information that I would seek on remand, we would at that point have a sufficient record on which to make a prompt and reasoned determination as to where the balance of hardships lies and whether the Plaintiffs, having raised serious questions on the merits, are entitled to preliminary relief.